**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard Charles MARSHALL,**
**Defendant-Appellant.**

No. 84–4691.

United States Court of Appeals,
Fifth Circuit.

May 30, 1985.

James C. McMichael, Jr. (court-appointed), Shreveport, La., for defendant-appellant.

Joseph S. Cage, Jr., U.S. Atty., D.H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before WISDOM, TATE, and DAVIS, Circuit Judges.

TATE, Circuit Judge:

After trial by jury, the defendant Marshall was convicted of the offense charged, the theft of a lawn mower of a value in excess of $100, which was the property of the United States. 18 U.S.C. § 641. Marshall appeals, contending that over his objection hearsay evidence was improperly admitted to prove an essential element of the crime, namely, that in fact a lawn mower had been stolen or was missing from the military post exchange where he worked. Finding merit to this contention, we reverse and remand.

## I.

The lawn mower was allegedly stolen from the Four Seasons Retail Store of the Army and Air Force Exchange Service on Barksdale Air Force Base near Shreveport, Louisiana. At the time, the defendant Marshall was supervisor (assistant manager) of that store, where he had worked for about ten years. The other principal actor in the evidentiary facts was Lee, the manager of the entire post exchange. (Prior to the incident in question, the relations between the two men were excellent. In fact, Lee testified that Marshall "was the best supervisor that he had" and that "he was

an extremely competent manager and I thought a great deal of him.")

The incident upon which the criminal charge was based arose during an end-of-summer promotional sale of "Lawn Boy" lawn mowers by the Four Seasons store from August 24 through September 8, 1983. These large lawn mowers, ordinarily retailing at $449, were to be sold at $335.95, in order to clear them from the premises over the winter.

On Saturday, September 3, while off-duty, manager Lee noticed one of the post exchange vans proceeding on the street he was driving on. Being curious as to why the van was in this locality, Lee followed it until it backed up into a driveway to a carport of a residence on Frederick Street in Shreveport (at a place some fifteen minutes driving distance from the post exchange). By then parked one-half block distant from the residence, Lee saw the driver, whom he testified he recognized as the defendant Marshall, alight and lift one by one two large boxes from the rear of the van and place them in the carport. The van then drove off. Lee drove up to the driveway and recognized the writing on one of the boxes as showing that it was a "Lawn Boy" packing box; the other box, although apparently (when lifted by the driver) lighter in weight, seemed similar to the first, although Lee was unable to decipher any wording on it.

The boxes were dropped at the Frederick Street residence at about 11:00 a.m., with the driver leaving at about 11:05 a.m., according to Lee. Believing that he had recognized the driver to be Marshall, Lee telephoned the Four Seasons store from a nearby convenience shop at about 11:15 a.m. and asked for Marshall; he was informed that Marshall was at B-Bay, a storage warehouse. About one and one-half hours later, Lee drove back by the Frederick Street residence and saw that the boxes were still in the same location, although they had been partially covered on the street side with one or two pieces of broken sheetrock.

When Lee returned to work on Tuesday, September 6, after Labor Day, he made discreet inquiries in order to ascertain the explanation for the activities seen that day. Finding no explanation, he finally, nine days later, called the defendant Marshall in to ask why he had been to Frederick Street. Marshall replied that he had never been there or in that locality, although he *had* been away from the store premises at another location in Shreveport from shortly after 10:00 a.m. until about 11:00 a.m. that morning.

II.

At the trial, the government did not introduce any evidence as to who had received the boxes at the Frederick Street residence, nor did it attempt to prove that the boxes, one of which was marked "Lawn Boy," actually did contain lawn mowers. Instead, it relied upon the following circumstantial evidence.

A store employee, McLain, testified that he had loaded two "Lawn Boy" mowers into a van about 9:30 a.m. for Marshall for storage at B-Bay. He did not see Marshall at the store again until about 11:30 a.m. He received a telephone call from an unidentified caller who asked him where Marshall was and (from his prior conversation) he thought Marshall was at B-Bay. Another co-employee stated he had seen the appellant entering the main gate of the base in a post exchange van at a time variously fixed by him at between 11:00 a.m. and 12:00 noon and between 11:00 to 11:15 a.m., and between 11:15 and 11:30 a.m. In addition, a post exchange key control record initialed by Marshall was introduced through the testimony of the Four Seasons manager (Bitner), which the government contends shows that Marshall had checked out a van between 10:00 and 11:30 a.m.; however, the witness (Bitner) also admitted that the record did not show to whom the key was actually issued for that entire period.

Finally, the government relies upon the testimony of Ms. Terri Stanlin, an investigator, who testified that, on the basis of

her review of the records of the post exchange store, three lawn mowers were unaccounted for and missing during the period of Four Seasons' promotional sale. Her testimony will be described more fully below. For reasons to be stated, we find its introduction over objection to represent inadmissible hearsay testimony used to prove that in fact lawn mowers were missing from the inventory of the Four Seasons store.

## III.

To counter the government's case, the defendant Marshall relied at trial upon his own testimony, that of his co-supervisor, Mrs. Boersema, and that of an employee at a service station (who confirmed Marshall's whereabouts at a location far from Frederick Street during his absence from the base from 10:00 a.m. to shortly after 11:00 a.m.).

Marshall himself testified that, after the lawn mowers were loaded into the van (to be held for customers who had called in and wanted to buy them), he found out from Mrs. Boersema that she had to leave at 12:00 noon. After conversation with her, confirmed by her testimony, he then decided to leave the store, while she was still there, on two store errands (to get a gas cap key made and to pick up a lawn mower part). He unloaded the lawn mowers from the van and left the store to do these errands, returning to the Four Seasons store at about 11:00 a.m. Mrs. Boersema confirmed that she had seen Marshall return into the store before or shortly after 11:00 a.m., having glanced at the clock as he came in.

Marshall also relies upon his cross-examination of the government investigator (Ms. Sandlin) and of a government witness (Bitner; the Four Seasons manager and the custodian of its records—although he was not called upon by the government to authenticate the Four Seasons lawn mower records) as showing the unreliability of Ms. Sandlin's opinion that three (or any) lawn mowers were actually missing, as she had testified on the basis of her deductions from the (incomplete) Four Seasons records. Although the manager Lee at trial testified positively that he had recognized the defendant Marshall as the driver of the van at the Frederick Street residence, Marshall also argued before the trial jury, unsuccessfully, that at the time of Lee's observation he could not have been so positive, in the light of his actions at the time. He did not, for instance, drive up and query the driver, whom he allegedly thought was his valued and trusted supervisory assistant. Also, within minutes, he called the store to see if Marshall was there, and he did not confront Marshall with his suspicions until some nine days after the incident.

## IV.

For reasons to be stated, we hold that reversible error was committed through the admission of hearsay evidence by the government investigator, based upon her lay opinion from business records not introduced in evidence and not authenticated as to their reliability (which, under the evidence, was doubtful). Before proceeding to this holding, we deem it advisable to dispose of two subsidiary issues, while our recitation of the evidence is fresh.

### A.

The government contends that, even if the admission of Ms. Stanlin's testimony was erroneous, the error was harmless. The government rather unconvincingly argues that the admissible evidence overwhelmingly proves Marshall's guilt. However, in the first place, if the testimony of Marshall's witnesses was to be believed (which was for the jury to determine), Marshall could not have been at the Frederick Street residence at the time Lee (thus mistakenly) believed that he saw him there. Also of importance, without Ms. Stanlin's testimony that lawn mowers were actually missing from the Four Seasons store, it is doubtful that the evidence would have proved beyond a reasonable doubt that the delivery by the driver (even if he was Marshall) of two boxes, of unknown content, showed that two lawn mowers, or any,

were dropped off at Frederick Street, even though one of the (perhaps previously discarded) boxes indicated that, at least at one time, a lawn mower had been contained within it.

Ms. Stanlin's testimony that lawn mowers had actually disappeared from the store was clearly harmful and perhaps central to the government's case. Without it, the evidence is open to question as to whether in fact any lawn mowers had disappeared without explanation from the Four Seasons store.

### B.

■ Marshall, on the other hand, contends that, if we find Ms. Stanlin's testimony to have been inadmissible, he is entitled to a reversal and to directions for an acquittal (rather than for a new trial, as we subsequently order). Marshall contends that, because of the inadmissibility of this testimony, the record evidence shows that the government did not prove an essential element of the crime, namely, that a lawn mower was in fact stolen from the Four Seasons store. He argues that, under these circumstances, the double jeopardy clause of the Fifth Amendment bars his retrial for the offense charged.

We are unable to agree. Pretermitting whether the evidence without Ms. Stanlin's testimony was sufficient to support the conviction, we must for double jeopardy purposes consider whether the record evidence, *including* the inadmissible evidence, discloses insufficient evidence of guilt to entitle the defendant Marshall to a judg-

ment of acquittal—as it clearly does *not.* We consistently "have reversed convictions for introduction of inadmissible evidence and remanded for new trial even when the only evidence in the record on an essential element was that excluded." *United States v. Sarmiento-Perez,* 667 F.2d 1239, 1240 (5th Cir.), *cert. denied,* 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 75 (1982). When we reverse in such instance, the reversal is "considered a reversal for a trial error," *id.,* and " '[i]t is axiomatic that the fifth amendment Double Jeopardy Clause does not prohibit the Government from retrying a defendant whose conviction has been set aside on procedural grounds.' " *Id.,* quoting *United States v. Houltin,* 566 F.2d 1027, 1034 (5th Cir.), *cert. denied,* 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978).

### V.

We now approach the issue raised by the admission of the evidence of Ms. Terri Stanlin, a safety and security investigator of the military post exchange service.

Ms. Terri Stanlin testified that, on being summoned on September 16 by manager Lee and informed of his observations of the delivery to the Frederick Street residence, she focused her investigation on "an attempt to make a determination if there was any missing merchandise" of the Lawn Boy lawn mower type in question. Learning there was a promotional sale, after conferring with Bitner, the Four Seasons manager,[1] she determined to review post exchange documentation, being "reports, pro-

---

**1.** It is well at this point to emphasize that Ms. Stanlin testified as a lay fact witness as to her deductions from the business records of the post exchange. While apparently the records she examined were at the suggestion of Bitner, their custodian, Ms. Stanlin was not offered as an expert nor, under the evidence, could she (relying on Bitner's suggestions alone as to what records to examine) have been qualified to give expert testimony as being "qualified ... by knowledge, skill, training, or education," Fed.R. Evid. 702, and thus, at least in some instances, entitled to testify as to an opinion or inference based on data or hearsay outside the record, Fed.R.Evid. 703. *See* 3 Weinstein's Evidence, ¶ 703[03] (1982).

We note also that Bitner, the custodian of the records, was not called by the government to authenticate the business records of Four Seasons as to the lawn mowers, Fed.R.Evid. 803(6), and that from the cross-examination of him by Marshall, see text at Part VI, *infra,* it is doubtful that his testimony would have shown that the records used by Ms. Stanlin to deduce that any lawn mowers were missing met the authentication threshold that, for the purposes noted (if they *had* been offered by the government), "the method or circumstances of preparation indicate ... trustworthiness." *Id.*

motional merchandise worksheets, key control records, price change vouchers, cash register journal tapes." Over hearsay objection, based on a review of those records (otherwise not specifically then identified), she determined that she had no doubt from these records but that there were three missing lawn mowers. Because of its importance, we set forth in the margin, in full, her testimony to this effect on the government's direct examination.[2]

When Ms. Stanlin was asked to state her opinion how many lawn mowers were missing, as basis on her review of a generalized description of the exchange records, Marshall's defense counsel objected that the witness was relying on information (the records) that cannot be confronted, and

that her testimony as to the contents of the documents, or without the documents being introduced into evidence, deprived him of a basis to question the accuracy of the documents. The district court initially agreed.

In a bench conference, the trial court overruled the defense objection and permitted Ms. Stanlin to testify as a fact that the store records showed that at least three lawn mowers were missing. Although the bench conference was untranscribed, both parties agree that during it, when the district court learned that the government had afforded Marshall's counsel access to all these records prior to trial, it overruled the defense objection and permitted full examination of Ms. Stanlin of her deductions

---

**2.** Record II, pp. 89–91, Government's direct examination of witness Terri Stanlin. The prosecutor is Mr. Jarzabek, and the defense counsel is Mr. McMichael.

Q. Based on your review of—first of all. What documents did you review?

A. I reviewed receiving reports, promotional merchandise worksheets, key control records, price change vouchers, cash register journal tapes and so forth.

Q. Based on a review of those documents, did you determine how many lawnmowers were missing?

MR. MCMICHAEL: Your Honor,—

A. Yes.

MR. MCMICHAEL: —objection. She's relying on information that cannot be confronted. If she's allowed to testify the contents of the documents without the documents being introduced, or the person who prepared the documents being present, I'm unable to question the accuracy of the documents.

THE COURT: The gentleman is correct. Now let Mr. Jarzabek respond, but let's do it this way before we get too far afield.

Mr. Hogan, would you join me in the back hall.

(BENCH CONFERENCE)

(Bench Off-Record)

THE COURT: Proceed, Mr. Jarzabek.

MR. JARZABEK: Thank you, Your Honor.

Q. Based on a review of those documents, did you determine how many lawnmowers were missing?

A. Yes.

Q. How many lawnmowers were missing?

A. Seven.

Q. Did you determine that there were any discrepancies in those documents that might possibly account for some number lower than seven?

A. Yes. There were two separate discrepancies.

Q. Would you describe each of those discrepancies?

A. The first discrepancy was in a journal tape from the register which by taking closing and opening readings determined approximately nine hundred and sixty dollars value of merchandise that could have been sold, the maximum. And that would be two lawnmowers sold that we would not have a record of.

The second discrepancy was on the promotional merchandise worksheet which a figure was not accurate which could have also accounted for two lawnmowers. That would bring that down to—

Q. Two more lawnmowers?

A. —two more lawnmowers.

Q. So its possible that we could be talking as few as three missing lawnmowers?

A. Yes.

Q. Is there any doubt in your mind that there were definitely three missing lawnmowers?

A. None whatsoever.

Q. And they're four hundred and forty-nine dollar Lawn Boy lawnmowers that we're talking about, correct?

A. Correct, but they had been on sale for three thirty-five.

Q. Okay. That's the next thing. They were on sale during this period of time and what was their sale price again, ma'am?

A. Three thirty-five ninety-five.

MR. JARZABEK: No further questions, Your Honor.

THE COURT: The witness is tendered for cross-examination.

from her (non-expert; *see* note 1) examination of the records.

■ Marshall correctly urges that, under the circumstances, this overruling of his timely specific exception, Fed.R.Evid. 103(a)(1), was a continuing objection that need not be repeated to preserve the objection to subsequent evidence admitted within the scope of the ruling. 21 Wright & Graham, Federal Practice and Procedure, § 5037 at pp. 191–92 (1977); McCormick on Evidence, § 52 at pp. 131–32 (3d ed., 1984). Further, in such instance, the cross-examination of a witness as to the inadmissible evidence, or the introduction by the ruling's opponent of rebutting evidence, does not waive the vitality of his continuing objection, for the party is entitled to rely upon the trial judge's ruling as the law of the case, without waiving his rights under the continuing objection to question subsequently on appeal the admission of any evidence of the nature specifically objected to by him initially.[3] Wright & Graham, *supra,* § 5039 at p. 202; McCormick on Evidence, *supra,* § 52 at p. 132 & n. 56.

■ The objection as formulated by Marshall's defense counsel (*see* note 2) was both to the hearsay nature of Ms. Stanlin's testimony when based on statements in records outside the evidence, Fed.R.Evid. 801,[4] and to the admission of evidence as to the contents of a record without production of the document itself into evidence, Fed.R. Evid. 1002,[5] with moreover a failure to authenticate the record by showing that it was what the proponent claims, Fed.R. Evid. 901(a)[6] which, in the case of a business record such as was involved, further required a showing of its trustworthiness for the purpose offered, Fed.R.Evid. 803(6).[7]

3. Thus, the defendant Marshall did not waive his continuing objection to testimony within the scope of the district court's ruling of admissibility by cross-examining Ms. Stanlin with regard to some of the documents she relied upon in testifying as a fact that the records showed that three lawn mowers were missing, or by introducing these documents in connection with this cross-examination—in order to show how unreliable was her estimate that any lawn mowers at all were missing from the store.

The situation would, of course, be different had Marshall introduced the documents for some purpose other than rebutting inadmissible evidence improperly admitted over objection. *See United States v. Mariani,* 539 F.2d 915, 921–22 (2d Cir.1976); *United States v. Truitt,* 440 F.2d 1070, 1071 (5th Cir.1971).

4. Fed.R.Evid. 801 provides, in part:
*Definitions*
(a) *Statement.* A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion.
(b) *Declarant.* A "declarant" is a person who makes a statement.
(c) *Hearsay.* "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. * *

As the hearsay exceptions indicate, a written record made by a declarant other than the witness is hearsay, when offered to prove the truth of the matter asserted. "Regularly kept records may be offered as evidence in many different situations, although in almost all the record is offered as evidence of the truth of its terms. In such case, the evidence is clearly hearsay and some exception to the hearsay rule must be invoked if the record is to be admitted." McCormick on Evidence, § 304 at p. 879 (3d ed., 1984). Here, of course, the government did not offer the record itself into evidence but, rather, evidence as to the contents of these records as showing that three lawn mowers were missing. However, the hearsay objection was clearly good as to the witness's testimony as to the contents of the record, although the objection also was based upon testimony as to contents of the record without producing the record itself, Fed.R.Evid. 1002, *see* note 5 *infra.*

5. Fed.R.Evid. 1002 provides:
*Requirement of Original*
To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.

6. Fed.R.Evid. 901(a) provides:
*Requirement of Authentication or Identification*
(a) *General provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. * * *

7. Fed.R.Evid. 803(6) provides:
*Hearsay Exceptions; Availability of Declarant Immaterial*

■ The objection was well-founded. The district court was in error in overruling this objection to inadmissible prejudicial evidence. The circumstance that the government had commendably afforded defense counsel to these records prior to trial did not obviate the necessity to produce proof as to their contents in accordance with the rules of evidence. We find no saving merit to the government's argument, without citation of relevant authority, that we should review the issue, as being whether there was an abuse of discretion in admitting the records, as *if* the records had been admitted (although they were not offered or introduced by the government). The issue as to whether the district court *would* have abused its discretion if it had admitted the records is not presented; for instead of the record itself the district court permitted introduction of Ms. Stanlin's "fact" testimony that her generalized review of the records showed that three lawn mowers were missing from the store. This evidence was clearly inadmissible and constituted reversible error.

## VI.

The error of permitting introduction of this evidence can even more clearly be seen by the subsequent course of the trial. At the oral argument on appeal, the government's counsel conceded that the records themselves were "gibberish" and could not be understood "without explanation." (Such explanation, of course, could only properly come from the records' custodian or from some other qualified witness, not from a lay witness testifying in conclusory form (further, without any attempt to explain the records she had examined), as to what was essentially her opinion [8] as to what these records showed as to whether any lawn mowers were missing from the store.)

On cross-examination by the defense counsel, Ms. Stanlin was asked to explain how she had arrived at her conclusion that three lawn mowers were missing. She first admitted that, because of the absence of inventory records except at the close of a year, "you could not determine at any given time exactly what was in the Four Seasons." She admitted that, ordinarily, one would have to know how many lawn mowers were on hand at a given time in order then to determine, by counting subsequent sales and by physical count of those still on hand, whether any lawn mowers were missing.

However, Ms. Stanlin stated that, since the lawn mowers were a promotional item,

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

(6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly coducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. \* \* \* The testimony of a custodian or other qualified witness is ordinarily essential to prove the nature of such record and what it purports to

show if not self-evident, 4 Weinstein on Evidence, ¶ 803(6)[02] (1984), and admissibility of such a record should be denied unless evidence adequately authenticates the record's accuracy or if "the sources of information or other circumstances indicate lack of trustworthiness," Rule 803(6), when the record is sought to be authenticated for its admission, *Id.,* ¶ 803(6)[07]. *See United States v. Sanders,* 749 F.2d 195, 197–98 (5th Cir.1984); *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 306–08 (5th Cir.1978); *United States v. Blake,* 488 F.2d 101, 105–06 (5th Cir. 1973).

8. Although offered as a fact witness, Ms. Stanlin's testimony was actually little more than an inadmissible opinion by a non-expert witness. *See* Fed.R.Evid. 701, which provides:

   *Opinion Testimony by Lay Witnesses*

   If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

she *could* determine how many were on hand on August 1, 1983, before the promotional sale, because a special form called a Promotional Merchandise Worksheet was prepared for these promotional sales, telling how many on hand at the beginning, how many sold, and how many remaining at the end of the sale.

The defense counsel then presented her with the worksheet for the promotional sale in question (Exhibit D–3).[9] This showed that fifteen lawn mowers were on hand at the start of the sale and that all fifteen had been sold by the conclusion (and, thus, that none were missing). Ms. Stanlin admitted that the document so showed, but she testified that she had determined that, instead of fifteen, seventeen lawn mowers were on hand during the period in question. R. II, p. 97. Later, Ms. Stanlin stated the original document (not introduced into evidence), unlike the photocopy, showed that as to one of the figures of machines during the period, a *"1"* had been changed from a *"3",* R. II, p. 98, which "to the best of [her] knowledge" had been changed by a Mrs. Newell (who was never called as a witness), R. II, pp. 99, 106, 111.

Thus, to establish her beginning count, Ms. Stanlin did not rely on the actual record of the store showing only 15 lawn mowers on hand at the start of the period (and all accounted for by subsequent sales). Instead, she relied upon her own out-of-court investigation, including hearsay information received by a declarant (Mrs. Newell) who did not testify, to conclude that the record *should* have shown 17 lawn mowers on hand—from which "corrected" total on hand as the witness had determined that two were missing at the conclusion of the sale.

Ms. Stanlin's method of determining how many lawn mowers had been sold proved, on cross-examination, likewise to be flawed.

In order to determine how many lawn mowers had been sold during the promotional sale, Ms. Stanlin examined the cash register tapes, after allowing for five lawn mowers that had been purchased on layaway. These tapes did not describe the merchandise sold; they merely listed dollar figures for each sale. Ms. Stanlin determined how many lawn mowers had been sold during the period by going through the tapes and counting the number of $335.95 figures that appeared (that being the sales price of the lawn mower). She testified on re-direct examination by the government that "[t]he only way that [the sales] is determined is by going back through all the sales tapes to determine there's only one item that sells for three hundred and thirty-five dollars, and you identify that as a lawnmower on sale being sold because of the price on the ticket." R. II, p. 103. By her methodology, she testified she found that five (of her seventeen) lawn mowers were missing and unaccounted for; but because *two* (see below) tapes were missing, as to which the running total of dollars sold disclosed that two more lawn mowers might have been sold, she concluded that she could positively testify that only three lawn mowers were missing.

On re-cross-examination, on examining the cash register tapes as produced under subpoena in court by the government (*see* note 9) but not offered by it as evidence, Ms. Stanlin then admitted that instead of only *two* tapes missing, seven or eight tapes were missing, R. II, p. 116, from the post exchange records subpoenaed from the government. Confronted with this circumstance (which, of course, admitted of the possibility that several more lawn mowers had been sold than those as initially determined by her), Ms. Stanlin admitted that she could not come up with the same figures as to those to which she had testified, but she averred: "It still would be

9. The defendant had issued a subpoena to the government to produce these records at trial. However, the government did not offer them into evidence, nor did the defendant as a whole, although the defendant did on cross-examination of government witnesses, by way of rebuttal, produce some of the records that tended to negate that any lawn mowers were missing or could be shown to be missing.

possible. It just would take a little more time." R. II, p. 119.

On further re-cross-examination, Ms. Stanlin also admitted that the use of the $335.95 figure on the cash tapes to determine the number of sales would not have accounted for sales: (a) if slightly defective merchandise had been sold by store personnel at a discount (and she admitted that she had not examined the "price change vouchers" that would have reflected this circumstance), R. II, pp. 120–21; and (b) if an exchange had been made of defective merchandise for a lawn mower on sale, in which case, she stated, "The defective merchandise would still be in the facility," R. II, p. 120, as to which she had not checked.

The inadequacy in these respects of using the $335.95 figure on cash register tapes, even had all tapes been properly kept, was confirmed by Bitner, the manager of the store and a government witness. He was called to authenticate the post exchange motor vehicle records, but not called or asked on direct to authenticate the store records with regard to the lawn mowers. On the defense cross-examination, he admitted that it was not "an uncommon situation" to sell slightly damaged equipment at a lower price, R. II, p. 149, which would thus not have been reflected on the cash register tapes at the $335.95. He also admitted that several of the tapes were missing from the period of the promotional sale, perhaps because the clerks sometimes forgot to change the tapes after they ran out, and that it was possible that "there could have been sales made during this period of time on cash registers that did not have a tape properly placed on them." R. II, p. 149.

Admitted over defense objection, the convincing and positive testimony of this witness, an investigator for an agency of the United States (with what weight that status might confer), was that the store records showed at least three lawn mowers were unaccounted for. Nevertheless, as our recitation above indicates, her positive conclusory opinion as to the number of lawn mowers missing was based upon a flawed methodology. For a starting figure of lawn mowers on hand, she had relied upon a hearsay "correction" of the actual store record; in determining the number of lawn mowers sold during the period, she had relied upon cash register tapes that were incomplete for the period in question (with the missing tapes quite possibly indicating other lawn mower sales that would make up the shortage she found).

## VII.

Our basic holding is that reversible error occurred because, over defense objection, the trial court permitted a non-expert witness to give prejudicial hearsay testimony as to the contents of documents that were not themselves introduced into evidence, which documents, moreover, could not have been introduced without prior authentication, including a query into their trustworthiness for the purpose for which introduced. *See* Part V, *supra.* We detailed in Part VI, *supra,* the unreliability of the testimony thus erroneously admitted only in order to illustrate that, by failing to apply the rules of evidence at issue, not only was their letter ignored but also their functional purpose as designed to assure trustworthiness of the evidence of this nature to be received, as well as to afford a fair opportunity to the opponent of the introduction of the evidence to prevent the trier of fact from being contaminated by unreliable prejudicial testimony.

*Conclusion*

For the reasons assigned, we REVERSE the conviction of the defendant Marshall, and we REMAND to the district court for a new trial in accordance with law.

REVERSED AND REMANDED.