**UNITED STATES of America, Appellee,**

v.

**Richard G. FREIDIN, Appellant.**

**No. 681, Docket 87–1428.**

United States Court of Appeals, Second Circuit.

Argued Jan. 28, 1988.

Decided June 8, 1988.

John S. Martin, Jr., New York City (Schulte Roth & Zabel, Marcy Ressler Harris, of counsel), for defendant-appellant.

Stuart E. Abrams, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Aaron R. Marcu, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES, NEWMAN and MINER, Circuit Judges.

OAKES, Circuit Judge:

This appeal involves a challenged application of the business record exception to the hearsay evidence rule. Fed.R.Evid. 803(6). Richard G. Freidin appeals from convictions on two counts in a four-count indictment, the first charging him with the filing of a false income tax return for the year 1979, in violation of 26 U.S.C. § 7201 (1982), and the second, with causing the submission of false statements to the Internal Revenue Service during an examination of that return, in violation of 18 U.S.C. §§ 1001 and 2 (1982). He was acquitted on two other counts charging income tax evasion in calendar years 1980 and 1981. After a jury trial before Judge John F. Keenan, in the United States District Court for the Southern District of New York, Freidin was sentenced to three years' imprisonment, with execution of the sentence suspended. Freidin was placed on probation with fines of $10,000 on each of the two counts and on condition that he serve 300 hours in community service. The principal claim on appeal is that a certain memorandum found in his employer's files should not have been admitted as a business record pursuant to Fed.R.Evid. 803(6), although the memorandum's admission is also objected to on Confrontation Clause (Sixth Amendment) grounds. Freidin urges that if the memorandum is excluded, insufficient evidence remains to support a verdict of guilt beyond a reasonable doubt and a judgment of acquittal should be entered. We do not reach appellant's Sixth Amendment claim because we agree, although not without hesitation, that the memorandum should not have been admitted under Rule 803(6). We do, however, reverse and remand for a new trial.

Appellant Freidin is a lawyer and certified public accountant who, after a brief period practicing law privately, in 1979 rejoined the "Big Eight" accounting firm Touche Ross & Co. as a senior tax partner. During that year, Freidin began serving on the advisory board of E.A. Sanford & Co. ("Sanford"), a holding company that had recently acquired a chain of retail department stores known as Cohoes Specialty Stores. Sanford's principal stockholder was a long time friend and client of Freidin, and while Freidin was involved in developing Sanford's Cohoes acquisition, Sanford hired Touche Ross to do some of the necessary tax and accounting work. Freidin spent a substantial amount of time, both individually and as a partner of Touche Ross, working on this acquisition and in August of 1979 Touche Ross billed Sanford a total of $18,700 for work in connection with it.

In December 1979 Freidin discussed the question of fees with Irwin Cohen, the audit partner of Touche Ross assigned to the Sanford account. Freidin advised Cohen that he felt Touche Ross was entitled to a more substantial fee than had been billed and that he would try to collect more money from Sanford. This, according to Cohen, Freidin tried unsuccessfully to do. Sanford was agreeable, however, to paying Freidin himself an additional fee for past and anticipated services on Sanford's advisory board. Freidin told Cohen that since much of his work for Sanford was done after he had rejoined Touche Ross, he would turn over whatever money he collected to the firm. Subsequently, Freidin did obtain $22,000 from Sanford for his services.

On December 26, 1979, Freidin deposited the check, which was made out to him, in his personal checking account at Manufacturers Hanover Trust Company. On the following day, he drew a personal check for

$22,000 payable to Touche Ross which he delivered or caused to be delivered to Touche Ross.

During the course of an IRS examination of the Freidins' 1979 tax return in the spring of 1982, the investigating revenue agent asked Albert Krupnick, a Touche Ross accountant who was attorney-in-fact for the Freidins' on the audit, to explain why Freidin had not reported the $22,000 Sanford fee. After consulting with Freidin, Krupnick informed the revenue agent that the $22,000 check had been paid over to Touche Ross and reported in Touche Ross's receipts as its income. It was this statement that furnished the basis for Freidin's conviction on Count Two.

In fact, the $22,000 had not been treated as income by Touche Ross but had been deposited in two capital accounts of Freidin, against one of which he subsequently drew. An internal office memorandum at Touche Ross memorializing Freidin's directive to place the $22,000 in those capital accounts is the critical piece of evidence objected to by Freidin.

Touche Ross maintained both mandatory capital accounts to which partners were required to make contributions and voluntary "capital loan" accounts into and from which partners could freely make deposits and withdrawals as they chose. The funds in the capital accounts are, however, the personal property of the individual partners and earn interest at one-half percent above the prime interest rate. There are three types of capital accounts. The first type is for paid-in, or required, capital, a figure determined annually by the partner's compensation level and which cannot be withdrawn until the partner leaves the firm. The second is a voluntary capital account into which a partner can put money on a temporary basis and withdraw it at any time. The third type is a mandatory "rollover" or "supplemental" capital account requiring payments equal to the tax benefits received by partners as a result of Touche Ross's reporting its income for tax purposes on a cash basis but distributing its profits to partners on an accrual basis.

Bertha Chinn, who was the manager of the partners' affairs offices, had principal responsibility at Touche Ross in connection with capital contributions by partners. In 1979 she was assisted by Parbatie Laloo Bisram and, occasionally, by Annette Colasanti, the secretary to the controller. Although Colasanti did not work in the partners' affairs office, she would help Bertha Chinn in that office when Parbatie Laloo Bisram was not available. On such occasions, Colasanti would keep track of the cash coming in for daily borrowings or investing and would be told the amounts collected and the total of any checks issued on a given day.

On the day that the Freidin check was delivered to the offices of Touche Ross, Bertha Chinn was on vacation and Annette Colasanti, who died several years before the trial in the case, was on duty. The critical memorandum is on a Touche Ross & Co. "Inter–Office Communication" form and reads as follows:

Touche Ross & Co.
INTER–OFFICE COMMUNICATION
Date 12/27/79—3:40 PM

To        Bertha
From      Annette
Subject   Richard Freidin
  Dick Freidin of New York Office
  gave me his check for 22M: *
            8M = Rollover Capital
            14M = Capital Loan
  He would like his full April distribution.
  * gave to Parbatie

In 1983 Colasanti gave an affidavit to the IRS which was read to the jury at Freidin's trial. In it Colasanti stated that she had no recollection of the particular incident at issue but would not have decided on her own into which account to deposit the Freidin check.

Also entered in evidence was an original Touche Ross & Co. cash receipt stamped December 27, 1979, 3:50 PM, and signed by "Parbatie Laloo" (Bisram), showing receipt of $22,000 from R.C. Freidin for Accounts 001–90–0200 and 001–90–0050. The numbers $8,000 and $14,000 are written next to these account numbers, but examination of the original cash receipt shows that the last two digits of the second entry, beginning 001–90–00—, were whited out and replaced with the numbers "5" and "0," written in

ink over the white-out. It is also clear that the "1" and "4" in the corresponding amount notation of $14,000 were also written over whited-out figures. These appear to have been two "2s" originally, justifying the inference that the entire $22,000 fee, at least initially, was intended to be deposited in a single account. Bertha Chinn testified that in her opinion, the numbers which were still readable under the white-out indicated that the receipt had first allocated the entire $22,000 for Freidin's paid-in capital account.

This cash receipt was not attested to in evidence other than by Parbatie Laloo Bisram who could say only that the signature was hers, but who could not say whether she had written the numbers. The witness had no recollection of the circumstances concerning the white-out. Bisram did testify, however, that she never made decisions on her own about the allocation of partners' contributions among the capital accounts, but acted only on instructions from Bertha Chinn or a written memorandum.

The Touche Ross books show that in fact $14,000 was deposited on December 28 to Freidin's capital loan account, and $8,000 was deposited on the same day to his rollover capital account. On January 1, 1980, Freidin also paid in another $700 to his capital loan account. The account had had a zero balance before the $14,000 deposit on December 28, 1979. There was a balance in Freidin's capital loan account of $14,703 (including $3 transferred from rollover capital) when, on April 1, 1980, Freidin withdrew a total of $10,000 by writing two checks against the account. He then deposited the checks in his personal checking account at Manufacturers Hanover Trust Company and immediately transferred $10,000 to a different account at the Mid–Atlantic National Bank in New Jersey. From

that account he in turn withdrew $10,000 on April 7, 1980, and on April 10, 1980, used the money to purchase an automobile. Freidin's 1979 personal income tax return did not report any part of the $22,000 fee received from Sanford; indeed, a total taxable income of only $19,000 was reported on his 1979 tax return.

The IRS became aware of the $22,000 Sanford payment to Freidin as a result of a separate, unrelated investigation of Sanford. It was thereafter that the audit of Freidin's returns for the years 1979, 1980, and 1981 was conducted and inquiry made of the accountant Albert Krupnick, who in turn reported Freidin's explanation that the $22,000 represented income to Touche Ross.

It should be noted that there was an *in limine* motion to exclude the December 27 memorandum from Annette Colasanti to Bertha Chinn under Fed.R.Evid. 803(6).[1] In denying the motion the district court found that the memorandum was made for Touche Ross business-related reasons and not for any personal purpose of Colasanti or in anticipation of any litigation, and that Colasanti had no motive to falsify the record in question. To support its conclusion, the court cited *Palmer v. Hoffman*, 318 U.S. 109, 113–14, 63 S.Ct. 477, 480–81, 87 L.Ed. 645 (1943); *McCormick on Evidence* § 308 (3d ed. 1984), and 4 J. Weinstein & M. Berger, *Weinstein's Evidence* § 803(6) at 803–183 (1983), adding that the sworn interview of Annette Colasanti added to the reliability of the memorandum.

### DISCUSSION

We note that admissibility under Rule 803(6) requires both that a memorandum have been "kept in the course of a regularly conducted business activity" and also

---

1. *Records of regularly conducted activity.*

   A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as

   shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
   Fed.R.Evid. 803(6).

that it was the "regular practice of that business activity to make the memorandum...." Moreover, all this must be shown by the "testimony of the custodian or other qualified witness" of the record. Finally, even if it meets these requirements, the memorandum cannot be admitted if the "source of information or the method or circumstances of preparation indicate lack of trustworthiness."

Bertha Chinn's testimony established that the cash receipt signed by Bisram containing the whited-out and written-over numbers was a record made and kept in the ordinary course of business at Touche Ross, and that document was admitted without objection. Chinn also testified about the December 27 Colasanti memorandum, explaining that the statement "He would like his full April distribution" meant that by making the $8,000 deposit, Freidin would have paid his full rollover capital assessment for the upcoming quarter so that nothing would be withheld from his share of the Touche Ross quarterly partnership profits. Chinn also explained that the notation " * gave to Parbatie" indicated, as one might suspect, that the money was given by Colasanti to Parbatie Laloo Bisram.

There was no testimony that making the December 27 memorandum was "the regular business practice" of Touche Ross. On the contrary, Bertha Chinn, the custodian of records pertaining to partners' affairs, testified that it was not the practice of Touche Ross to have Colasanti prepare any memoranda or directions relating to partners' capital accounts. She said she had not seen the December 27, 1979, memorandum until 1982, nor could she recall ever having received any such memoranda from Colasanti. Rather, Chinn testified it was not common practice for any employee other than a partner's secretary, pursuant to his or her directions, to prepare an inter-office memorandum with instructions on the allocation of the partner's funds among the capital accounts.

According to Colasanti's affidavit, which was admitted in evidence, her regular duties included "typing, filing, answering the telephone and taking messages." Her superior, the Director of Financial Affairs, Elaine Cereghini, testified that apart from Colasanti's secretarial duties, her only routine responsibilities were in the area of cash management, that is, accumulating on a daily basis information regarding the amounts of money taken in and disbursed by the national office of Touche Ross. Cereghini stated that it was "not the common practice for either myself or my secretary to prepare any type of inter-office communication" in connection with the receipt of partners' checks. Thus, it is difficult to say that it was the "regular practice" of Touche Ross to make such a memorandum. Rather, it appears that the memorandum produced was an isolated document. See United States v. Mendel, 746 F.2d 155, 166 (2d Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); FAA v. Landy, 705 F.2d 624, 633 (2d Cir.), cert. denied, 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983).

The Government, however, argues that because it was Annette Colasanti's responsibility—at least when other employees were unavailable—to keep track of moneys received in the partners' affairs office, some record had to be generated to show the allocation of the funds that Colasanti received. Therefore, the argument goes, the making of the record was "implicit" in Colasanti's obligation to receive and account for such moneys. This argument ignores the stated practice that partners' secretaries regularly made such records. It also ignores that the Touche Ross cash receipt was the record required to be used to account for funds received from partners.

In reading strictly the "regular practice" requirement of Rule 803(6), we are cognizant of more generous interpretations of the rule. We recognize, for example, the statement in 4 J. Weinstein and M. Berger, Weinstein's Evidence § 803(6)[03], at 803–182, cited by the district court, that:

Since Congress did not intend to make the business record exception more restrictive than it had previously been, Rule 803(6) should be interpreted so that

the absence of routineness without more is not sufficiently significant to require exclusion of the record. Nonroutine records made in the course of a regularly conducted "business" should be admissible if they meet the other requirements of Rule 803(6) unless "the sources of information or other circumstances indicate a lack of trustworthiness."

(Citing *United States v. Prevatt*, 526 F.2d 400, 403 (5th Cir.1976); *Magnus Petroleum Co. v. Skelly Oil Co.*, 446 F.Supp. 874, 882–83 (E.D.Wisc.1978), *rev'd*, 599 F.2d 196 (7th Cir.), *cert. denied*, 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979)). There is a statement as well in our own *Saks International, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir.1987), that the "principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have

sufficient indicia of trustworthiness to be considered reliable."

But we also note that as originally proclaimed by the Supreme Court, Rule 803(6) did not contain the phrase "if it was the regular practice of that business activity to make the memorandum...." This addition was made by Congress, initiated by the House, with ultimate acquiescence by the Senate in conference.[2] As the Weinstein and Berger treatise points out at 803–181, "[a] virtually identical requirement had been contained in the Federal Business Records Act," formerly 28 U.S.C. § 732. In interpreting that identical language, "[n]umerous courts," the treatise acknowledges, "had stated in dicta that the Act required not only that the record be made in the ordinary course of business, but also that it was the regular course of business to make that particular type of record." *Id.* (citing, *e.g.*, *Gass v. United States*, 416

---

2. As originally promulgated by the Supreme Court, the rule did not contain the clause "and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation...." It also lacked the last clause, which expands the number of entities to which the rule applies.

The House Report commented on the addition to the rule:

Rule 803(6) as submitted by the Court permitted a record made "in the course of a regularly conducted activity" to be admissible in certain circumstances. The Committee believed there were insufficient guarantees of reliability in records made in the course of activities falling outside the scope of "business" activities as that term is broadly defined in 28 U.S.C. 1732. Moreover, the committee concluded that the additional requirement of Section 1732 that it must have been the regular practice of a business to make the record is a necessary further assurance of its trustworthiness. The Committee accordingly amended the Rule to incorporate these limitations.

Report on Federal Rules of Evidence, Committee on the Judiciary, H.R.Rep. No. 650, 93d Cong., 1st Sess. 14 (1973), *reprinted in* 1974 U.S. Code Cong. & Admin. News 7075, 7087–88. The Senate Committee on the Judiciary disagreed as to the scope of activities to be covered by the rule and deleted the word "business" as it appeared before "activity" to cover not-for-profit (or illegal) activities. S.Rep. No. 1277, 93d Cong., 2d Sess. 16–17, *reprinted in* 1974 U.S. Code Cong. & Admin. News 7051, 7063. *See* J. Weinstein & M. Berger, *supra,* at 803–10 to 803–14.

After the rule was enacted by Congress in its present form, the Advisory Committee on the Rules of Evidence evidently amended its original note to read:

The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation. McCormick §§ 281, 286, 287; Laughlin, Business Entries and the Like, 46 Iowa L.Rev. 276 (1961). The model statutes and rules have sought to capture these factors and to extend their impact by employing the phrase "regular course of business," in conjunction with a definition of "business" far broader than its ordinarily accepted meaning. The result is a tendency unduly to emphasize a requirement of routineness and repetitiveness and an insistence that other types of records be squeezed into the fact pattern which give rise to traditional business records....

Federal Rules of Evidence Annotated 113–14 (1975). The ellipsis represents the deletion of language paralleling the position of the Senate Committee:

The rule therefore adopts the phrase "the course of a regularly conducted activity" as capturing the essential basis of the hearsay exception as it has evolved and the essential element which can be abstracted from the various specifications of what is a "business."

Proposed Rules of Evidence 113 (1971). Note, however, that the Advisory Committee did not omit the penultimate sentence of the passage.

F.2d 767, 772 (D.C.Cir.1969); *Thomas v. Hogan,* 308 F.2d 355, 360 (4th Cir.1962)).

Is it true, then, as the treatise seems to suggest,[3] that, despite the plain words of the statute, all of the requirements of Rule 803(6) for admissibility have been collapsed into one—the showing of sufficient indicia of trustworthiness? Certainly this circuit appears to have taken a generous view of the rule, construing it to " 'favor[ ] the admission of evidence rather than its exclusion if it has any probative value at all.' " *In re Ollag Constr. Equip. Corp.,* 665 F.2d 43, 46 (2d Cir.1981) (quoting *United States v. Carranco,* 551 F.2d 1197, 1200 (10th Cir.1977)). However, while we did say in *Saks International, Inc. v. M/V Export Champion,* 817 F.2d at 1013, that the *"principal* precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable" (emphasis added), we have never said it was the *only* precondition.

Cases from other circuits not discussed in the treatise, while not answering conclusively the collapsibility question posed above, point to requiring, in conformity with the congressional addition to the rule, note 2 *supra,* that the particular record be made as a regular practice of the business.[4] A divided Third Circuit panel, for example, has suggested that "usual practice" is insufficient to meet the rule's requirement of "regular practice," at least as to negative record evidence. *See Armstead v. United States Dep't of HUD,* 815 F.2d 278, 282 n. 3 (3d Cir.1987), and *id.* at 285 n. 1 (dissenting opinion). The Seventh Circuit has held that pre-hospital history in a hospital

record coming from a patient, his family, or third parties is inadmissible under Rule 803(6) since the relating of such information " 'is not part of a "business routine" in which [the declarant] is individually a regular participant.' " *Cook v. Hoppin,* 783 F.2d 684, 690 (7th Cir.1986) (quoting *Petrocelli v. Gallison,* 679 F.2d 286, 290 (1st Cir.1982)). Trustworthiness is not discussed in *Cook.*

The First Circuit, in holding admissible an automobile dealer's parts inventory, adding machine tapes, and automobile sales records, emphasized that these were attested to by the dealer as "regularly prepared," "relied upon in the conduct of [the] business," and "filled out in the regular course of business." *Wallace Motor Sales v. American Motor Sales,* 780 F.2d 1049, 1061 (1st Cir.1985).

While the Fifth Circuit speaks of the need to make an affirmative showing of a proffered document's trustworthiness, *see, e.g., United States v. Marshall,* 762 F.2d 419, 425–26 n. 7 (5th Cir.1985), a review of Fifth Circuit cases suggests that establishing the "regular practice" element of the rule is necessary to such a showing. *United States v. Sanders,* 749 F.2d 195, 197–98 (5th Cir.1984) (document must have been " 'kept pursuant to a routine procedure designed to assure [its] accuracy' ") (quoting *Capital Marine Supply, Inc. v. M/V Roland Thomas II,* 719 F.2d 104, 106 (5th Cir.1983)), *cited in United States v. Marshall,* 762 F.2d at 425–26 n. 7. Similarly, the D.C.Circuit, in holding certain records properly excluded, has stressed that "it was not a regular business practice to make [such] memoranda...." *United*

---

**3.** The Weinstein and Berger treatise says, for example, that "the absence of routineness without more is not sufficiently significant to require exclusion of the record," 4 J. Weinstein & M. Berger, *supra,* at 803–182, and as to *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), that on its facts it "should be differently decided under the Federal Rules," 4 J. Weinstein & M. Berger, *supra,* at 803–182 n. 4.

**4.** If trustworthiness were the only test, it would be hard to say that Judge Keenan abused his discretion, *Saks Int'l, Inc. v. M/V Export Champion,* 817 F.2d at 1013, in admitting the Colasanti memorandum. Apart from a conspiracy-to-

frame theory, it is difficult to conjure up any justification for distrusting the memorandum. Moreover, the entries on the properly admitted cash receipt made ten minutes later as corrected are consistent with (A) the disputed Colasanti memorandum, (B) the actual deposits recorded by the Touche Ross accounting department, and (C) Freidin's withdrawals from his capital loan account four months later.

On the other hand, the safeguard of this being a memorandum required to be made is not present as it was in *United States v. Mendel,* 746 F.2d at 166, or *FAA v. Landy,* 705 F.2d at 633.

States v. Lemire, 720 F.2d 1327, 1350 (D.C. Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). Trustworthiness—or its lack—is not mentioned.

In the end, though we believe the better rule would permit admission of the Colasanti memorandum, we must respect Congress's addition of the phrase. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1406, 94 L.Ed.2d 542 (1987) (" '[D]eference to the supremacy of the Legislature … generally requires us to assume that "the legislative purpose is expressed by the ordinary meaning of the words used." ' ") (quoting *United States v. Locke*, 471 U.S. 84, 95, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985) (quoting *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962))). As such, since the Colasanti memorandum was not shown to have been made pursuant to a "regular practice" of Touche Ross, it must be held inadmissible. *See United States v. Robinson*, 700 F.2d 205, 210 (5th Cir.1983); *United States v. Kim*, 595 F.2d 755, 761–62 (D.C.Cir.1979). Nor was it harmless error to have held otherwise, since the Colasanti memorandum provided strong evidence of Freidin's intent, directly linking him to the capital account transactions that took place ten minutes later. Nonetheless, having excised the memorandum from the record, we will not assess the remaining evidence for sufficiency. *See United States v. Marshall*, 762 F.2d at 423; *United States v. Bibbero*, 749 F.2d 581, 586 n. 3 (9th Cir. 1984), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985); *United States v. Key*, 725 F.2d 1123, 1127 (7th Cir.1984).

Judgment reversed and case remanded for a new trial.