Allan H. SELIG, Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 83–2330.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1984.

Decided July 27, 1984.

Gayle P. Miller, Atty., Tax Div., Dept. of
Justice, Washington, D.C., for defendant-
appellant.

David E. Beckwith, Foley & Lardner, Milwaukee, Wis., for plaintiff-appellee.

Before BAUER and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

BAUER, Circuit Judge.

The government asks this court to overturn the district court's ruling in favor of Plaintiff Allan "Bud" Selig, part owner of the Milwaukee Brewers. The district court held that Selig properly allocated $10.2 million of the $10.8 million purchase price of the Seattle Pilots to the value of the 149 players he bought. We affirm.

I

*The theory of the game is that one side takes the field, and the other goes in. The pitcher then delivers the ball to the striker, who endeavors to hit it in such a direction as to elude the fielders, and enable him to run around all the base lines home without being put out. If he succeeds a run is scored.*[1]

This year the United States celebrates the centennial of a momentous event in its grand sports history: the introduction of overhand pitching into major league baseball. Although organized baseball and the games from which it derived had been played for many years,[2] overhand pitching and the switch to a cork-center baseball in 1911 were two of the final major steps toward the game as we enjoy it today.

The National Association of Professional Base-Ball Players was born in 1871. In the first recorded professional game, the Kek-iongas franchise of Fort Wayne defeated Forest City of Cleveland, 2 to 0. Franchises cost $10. Notably, the White Stockings of Chicago led the league throughout the season and appeared headed for the pennant until an accident in Mrs. O'Leary's barn destroyed their ball yard along with most of the city. Forced to play their remaining games on the road, the White Stockings lost three straight games and the flag to the Athletics of Philadelphia. The birth of the National League in 1876 spelled the end of the National Association. The new Chicago franchise ran away with the pennant in the inaugural season. The American League began in 1901, the result of the nation's yearning for more baseball and the NL's reluctance to expand. Again, a Chicago franchise helped lead the way. The White Sox, headed by AL co-founder Charles Comiskey, won the first-ever AL game and went on to win the league crown. In the first interleague World Series in 1903, Boston, led to the pennant by Denton True "Cy" Young's[3] 32 wins, beat Pittsburgh in a best five-out-of-nine series.[4]

Baseball abounds with legendary players,[5] teams, and events. Some of the greatest memories include Willie Keeler's 44-game hitting streak in 1897; Jack Chesbro's 41 wins in 1904; the 1907 batting title to Ty Cobb—his first of 12; Christy Mathewson's 68 innings without walking a batter in 1913; Babe Ruth hitting 29 home runs in 1919, 54 in 1920, 59 in 1922, and 60 in 1927—all league records; Jim Bottomly hitting in 12 runs in a 9-inning game in 1924; Ruth calling his shot in the 1932 Series; a 1940 Opening Day no-hitter for Bob Feller; Joe DiMaggio's remarkable

---

1. Encyclopedia Britannica, 1890.

2. In fact, archeologists have discovered etchings carved almost 4,000 years ago of women playing ball, and one prominent historian believes that all modern ball games evolved from ancient religious rites introduced 5,000 years ago or more. R. Henderson, Ball, Bat and Bishop (1947).

3. Y is for Young
   The Magnificent Cy;
   People batted against him,
   But I never knew why.

   Ogden Nash.

4. Baseball's first intracity World Series and greatest World Series upset occurred in 1906. The Chicago White Sox, who had strung together 19 victories to steal the AL crown from New York, stunned the mighty Chicago Cubs, who reigned supreme in the NL from 1906 through 1910 behind the tough defense of Steinfeldt, Tinker, Evers, and Chance, and who had won a league-record 116 games in 1906.

5. *See Flood v. Kuhn*, 407 U.S. 258, 262–63, 92 S.Ct. 2099, 2102–03, 32 L.Ed.2d 728 (1972).

1941 season: .357, 30 home runs, 125 RBI, and the 56-game streak; Enos Slaughter scoring from first on a single to break an 8th-inning tie in the seventh game of the 1946 Series; Connie Mack bowing out in 1950 after 50 years as the Athletics field general; "the catch" by Willie Mays robbing Vic Wertz in the 1954 Series; Roger Maris's 61st home run in 1961; the perfect Sandy Koufax on September 9, 1965; Hank Aaron's momentous blast on April 8, 1974; and countless others. And true baseball fans know of the ill-fated careers of Ray Chapman and Wally Pipp.[6]

## II

*A tonic, an exercise, a safety-valve, baseball is second only to Death as a leveler. So long as it remains our national game, America will abide no monarchy, and anarchy will be too slow.*[7]

The first franchise shift of this century occurred when the Boston Braves moved to Milwaukee in 1953. The Braves were a financial success, drawing more than two million fans each year from 1954 to 1957. This prosperity contributed to the development of baseball on television. The Braves won the World Series in 1957 (defeating the almost invincible New York Yankees), and repeated as pennant winners in 1958.

The Braves' fortunes changed, however, in the early 1960's. Attendance and the team's standings slid. New owners acquired the team in 1962, but, although attendance rose, the team finished in sixth place in 1963 and fifth in 1964. The Braves moved the team to Atlanta, Georgia, in 1966, leaving Milwaukee without a major league franchise. The State of Wisconsin's efforts to stop the move failed. *See State*

*v. Milwaukee Braves, Inc.*, 31 Wis.2d 699, 144 N.W.2d 1, *cert. denied,* 385 U.S. 990, 87 S.Ct. 598, 17 L.Ed.2d 451 (1966).[8] In 1965, Plaintiff Allan Selig and others organized the Milwaukee Brewers Baseball Club, Incorporated in an effort to secure another franchise for the city. The organization negotiated unsuccessfully for the purchase of the Chicago White Sox.

In the meantime, the American League voted to add two expansion teams to begin play in 1969. The league awarded the franchises to organizations in Kansas City and Seattle. Among other expenses, the Seattle Pilots and the Kansas City Royals each paid $5.25 million for thirty players ($175,000 each) acquired from the ten other AL teams through an expansion draft, and $100,000 for their franchises. In anticipation of getting its franchise, the Seattle organization bought the Seattle Angels, a AAA minor league club, and signed a working agreement with another minor league club in Newark, New York.

The Seattle Pilots played ball from April to September 1969, but sunk into financial difficulties with operating expenses of more than $3.7 million. As a result, the Pilots' owners decided to sell the team. Selig learned of the Pilots' financial plight and contacted the team owners. By September 1969, the parties tentatively agreed that Selig would buy the Pilots, including 149 players, for $10.8 million.

The deal was conditioned on Selig's organization (the Brewers) securing league approval to move the team from Seattle to Milwaukee. That approval did not come immediately. Instead, the American League first tried to save the Pilots with league money. The league's efforts failed,

---

6. Ray Chapman, star shortstop of the Cleveland Indians, was killed by a pitch thrown by Carl Mays on August 17, 1920. Wally Pipp, complaining of a headache, was replaced at first base by Lou Gehrig on June 2, 1925. Pipp never again started a game for the Yankees.

7. Allen Sangree, 1907.

8. The Wisconsin Supreme Court reversed a circuit court ruling that the defendants violated

state antitrust laws. In a thoughtful opinion by Justice Fairchild, the court held that because baseball enjoys an exemption from federal antitrust laws based on United States Supreme Court decisions and the tacit approval of Congress, application of state antitrust law to league decisions to admit or move franchises would conflict with national policy. 31 Wis.2d at 722–32, 144 N.W.2d 1.

and Seattle, at the suggestion of the Brewers' lawyers, petitioned for bankruptcy in March 1970.

Meanwhile, the Brewers and the Pilots on March 8 signed a written contract for the purchase and sale of the Pilots for $10.8 million. The deal was stymied by the league's continued reluctance to approve the move to Milwaukee. The bankruptcy court rescued the deal, however, by ordering the sale of the Pilots by April 1, 1970, and on that day the transaction was completed. The Milwaukee Brewers played their first game six days later.

The contract between the Pilots and the Brewers allocated $100,000 of the purchase price to equipment and supplies, $500,000 to the value of the franchise including league membership, and $10.2 million to the player contracts. The $100,000 allocation is not contested. In the fall of 1970, the Brewers solicited four separate appraisals of their 149-man roster as of April 1, 1970. The appraisals established an average value of $10,043,000, and the Brewers' financial officer decided to retain the $10.2 million allocation. Selig then amortized that cost over the players' five-year useful lives under Section 167(a) of the Internal Revenue Code.[9] The $500,000 allocated to the franchise could not be amortized, because the franchise had no definable limited useful life. Selig thus benefited by allocating as much of the purchase price of the Pilots as possible to the value of the player contracts.

The Internal Revenue Service in 1979 disallowed the entire $10.2 million allocation, attributed zero value to the player contracts, and made the concomitant adjustments in Selig's tax liability for 1967, 1968, and 1970 through 1976. On December 27, 1979, Selig received deficiency notices totaling a little more than $141,000. Selig paid the deficiencies plus interest and applied for a refund in 1980. In March 1981, the refunds were disallowed and this lawsuit was filed.

### III

*I honestly feel it would be best for the country to keep baseball going. There will be fewer people unemployed and everybody will work longer hours and harder than ever before.*[10]

The district court held that Selig's allocation was proper. *Selig v. United States,* 565 F.Supp. 524 (E.D.Wis.1983). The court first established the ground rules for determining the value of the player contracts. The court noted that baseball players are bought, sold, and traded in three principal markets. The most common is the "player" market, in which the teams negotiate transactions involving individuals or small groups of players. Most of the transactions in the player market involve players traded individually for dollars or for other players given up at the time of the trade or a specified later time. The player market reflects the value of individual players to existing teams dealing with other existing teams. The player market is not a "free" market, however; baseball's waiver and reserve rules pose considerable restraints on the supply of players and the prices of those players. Under certain circumstances, the rules fix the price of players in this market. The district court thus determined that data from transactions in the player market were not reliable for establishing the value of the Brewers' 149-man roster in 1970.

The second market that the district court described is the free agent market. In that market, players who have never before contracted with a major league or minor league club individually negotiate their contracts. (The right of veteran players no longer under contract to declare themselves free agents and compete for dollars in the re-entry draft did not arise until

---

**9.** The issue whether the Section 167(a) depreciation allowance applies here to intangible assets purchased in a bundle of interrelated assets was settled in *Laird v. United States,* 556 F.2d 1224 (5th Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978), and is not raised in this appeal.

**10.** Franklin D. Roosevelt, 1942.

1976.) Prices are not fixed in the free agent market. The district court nonetheless determined that the values of individual free agents were not representative of the value of players in a bulk sale of club assets.

Player contracts also are purchased when entire teams are sold. Those sales include all of a team's physical assets in addition to the player contracts and the franchise rights. The district court determined that this "club" market most accurately reflects the value of the team and its players because the purchase price results from arms-length negotiations between a willing buyer and a willing seller.

After determining that only the club market was relevant to the valuation issue, the district court analyzed the evidence from both parties. The plaintiff offered four appraisals of the Brewers' 149-man roster that the team solicited in the fall of 1970. The first appraisal, prepared by Frank "Trader" Lane, established a roster value of $10.35 million. Lane was a friend of the plaintiff, and later became general manager of the Brewers. The court ruled that this relationship did not taint the appraisal. Cedric Tallis, general manager of the other 1968 expansion club (Kansas City), prepared the second appraisal. He also calculated a value of $10.35 million for the Brewers' player contracts. Tallis relied both on personal observations and on statistics in formulating his appraisal. The court accepted this appraisal, too.

The court refused to rely on the plaintiff's other two appraisals. Those appraisals were prepared by Marvin Milkes and Bobby Mattick, both of whom served as employees of the Pilots and then the Brewers from 1968 through 1970. The court ruled that these men were not sufficiently independent to ensure that their assessments were accurate. Milkes and Mattick set the roster value at $9.7 million and $9.8 million respectively.

The plaintiff also offered evidence of the cost of player development, the amount of insurance on the roster, and the high prices being paid for players in the free agent market. In addition, an economics expert testified that because Milwaukee had a smaller population than most other major league cities and competed with several other franchises for fan support, the Brewers franchise was not very valuable. The district court ruled that all of this evidence was admissible and supported the $10.2 million allocation to the player contracts.

The government offered the expert testimony of economist Roger Noll as evidence that $10.2 million was a disproportionate amount of the purchase price to allocate to the player contracts. Noll used two methods to value the contracts. One method calculated the percentage of revenues that were sensitive to the quality of the team. This figure was set more or less arbitrarily at one third of all revenues. Once determined, the same percentage became the percentage of the purchase price of the team properly allocable to the player contracts. Noll's second method employed a sophisticated multiple regression analysis to set a value for each of the 149 players. Noll concluded that the players' contracts were worth no more than $6 million. The district court rejected the income sensitivity analysis in part because the percentage of revenues assigned to team quality bore no necessary relationship to the fair market value of the player contracts. On the other hand, the court accepted the validity of the regression analysis, but nonetheless deemed the results unpersuasive principally because the initial data relied on player values set in the player market rather than in the club market.

The government also offered two appraisals. The first was prepared by Dewey Soriano, president of the Seattle organization that secured the Pilots in 1968. Soriano set a value of $3.2 million for the player contracts. The court ruled that Soriano's estimate was unreliable, in part because it was significantly lower than the value Soriano put on the players when he sold the team to the Brewers in 1970. The government's second appraiser, Richard Walsh, was general manager of the California Angels from 1968 to 1971. He calculat-

ed the roster value at $5.1 million. The court afforded little weight to Walsh's appraisal, which was based mainly on transactions in the player market and was the product of statistical research rather than first-hand knowledge of the players.

Because the district court concluded that the Brewers' roster could be evaluated properly only with reference to the market in which entire clubs are bought and sold, the court did not accept the government's evidence that was based on transactions in other markets. The court compared the plaintiff's evidence with the remaining government evidence, principally the appraisals. The court concluded that the plaintiff sustained his burden of proving by a preponderance of the evidence that the $10.2 million allocation to player contracts was reasonable.

## IV

*Show me a good loser, and I'll show you an idiot.*[11]

On appeal, the government claims that the $10.2 million allocation to player contracts is "plainly wrong" and "contrary to common sense." The government argues that the fair market value of the franchise is more than five percent of the purchase price of the club. Why would anyone pay more than $10 million, the government asks, for a team when the franchise is "essentially worthless?"[12] Appellant's br. at 30. Without the right to play baseball in the American League, the government adds, the team could not survive. The government stresses that its evidence at trial established that the franchise consti-

tuted most of the $10.8 million value of the Brewers. In addition, the government argues that the district court improperly relied on certain evidence of player contracts values offered by the plaintiff. Finally, the government objects to the court's decision to disregard economist Noll's regression analysis, which was based on a compilation of all American League transactions in the player market from March 1964 through 1974.[13]

### A

*Time is of the essence. The shadow moves*
*From the plate to the box, from the box to second base,*
*From second to the outfield, to the bleachers.*
*Time is of the essence. The crowd and players*
*Are the same age always, but the man in the crowd*
*Is older every season. Come on, play ball!*[14]

■ Because valuation is a factual determination, our review of the district court's findings is limited to determining whether they are clearly erroneous under Federal Rule of Civil Procedure 52(a). *E.g., Laird v. United States,* 556 F.2d 1224 (5th Cir. 1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978). The valuation is an approximation; we will affirm the district court's determination absent clear error, even if we would not have reached precisely the same figure if we had tried the case ourselves.[15]

---

**11.** Leo Durocher.

**12.** We note that the plaintiff did allocate $500,000 to the franchise. You take $500,000 here and $500,000 there, and pretty soon you are talking about real money.

**13.** We note that the government's use of a Noll's averaging analysis to prove player values has been disregarded in the past. *See esp. Laird,* 556 F.2d at 1238 & n. 22.

**14.** Rolfe Humphries, from Polo Grounds.

**15.** The government in effect argues that the district court applied the wrong economic theo-

ry to reach its result. This is different from deciding whether the judgment is clearly erroneous. We need not enmesh ourselves in a technical debate about economic theory. We instead must review the evidence in the record; if the judgment then appears reasonable and supported by the evidence, we must affirm.

Almost every position advanced by the government has a converse argument of merit favoring the plaintiff's position. For example, the government insists that an assembly of players and equipment is worthless if there is no franchise; and the limited number of franchises and the difficulty in securing one enhances its value. But conversely, a franchise is not worth

■ First, we address the district court's market analysis. The government argues that it is unrealistic to value the players in the "free" club market when the players will be dealt in the future in a market containing restraints. This argument ignores the reality of the transaction at issue here. The club market is a distinct market. Transactions in the club market take place free of baseball rules, and purchase prices are a result of arms-length negotiations between willing sellers and willing buyers. Here, the Brewers bought a fully staffed baseball enterprise from an organization which desired to sell it. The task of the district court in evaluating this sale for tax purposes was not to assign specific values to individual players, but rather to allocate the purchase price among all the club's assets. In contrast, a sale in the player market or free agent market is a different transaction economically, subject to different restrictions, and may result in attaining values for the players substantially different from those attained in a bulk sale in the club market. Because the transaction here occurred in the club market, we find no error in the district court's decision to rely on data derived from analyses of that market.

■ Next, we review the government's claims that the plaintiff's evidence was inadequate to support the district court's conclusions. The district court relied on two of the plaintiff's four appraisals in making its determination. The government attacks the admissibility of these appraisals, claiming that they do not qualify as hearsay exceptions under Federal Rule of Evidence 803(6). We disagree. Although the appraisals were prepared in the fall of 1970, several months after the Brewers started play, their preparation was sufficiently contemporaneous with the April 1 closing to constitute business records. The Brewers were busy with many affairs through the spring and summer of 1970. It does not seem extraordinary that the appraisals were ordered several months after the organization began business.

■ The appraisals also satisfy the regularity requirements of Rule 803(6). Most businesses must prepare as a matter of course documents relevant to tax matters. That alone does not disqualify them as business records in a case involving tax issues. The appraisals were prepared in the regular course of the management of the team, and the government points to nothing extraordinary in their preparation. Also, no evidence suggests that the appraisals were prepared in anticipation of litigation.

■ The district court also relied on the plaintiff's evidence of the high cost of player development, the amount of insurance for the players on the roster, and, to counter the government's evidence that transactions in the player market indicate that the Brewers players were worth far less than $10.2 million, the high prices being paid for players in the free agent market.[16] The

___

much without players, and the cost of obtaining and developing players has risen to incredible levels. The plaintiff's costs in 1970 to assemble 149 baseball players suitable to staff a major league enterprise if the rules would have allowed it would have been prohibitive if all he had was a franchise right to play in the American League. (The price for a player obtained through the expansion draft in 1968 was set by existing club owners at $175,000.) In addition, setting the player contract values high relative to the franchise value does make economic sense. The value of modern franchises is reflected in the enormity of the players' contracts. The players are valuable precisely because the owners may make a lot of money from a successful franchise. It would be inappropriate for us to reverse the district court on the basis of

the government's economic theorizations when the plaintiff presented enough evidence to make reasonable a verdict in his favor.

16. In addition, Leland MacPhail, executive vice-president and general manager of the New York Yankees from 1967 through 1973 and later president of the American League, gave the following answers when questioned about the 1968 expansion draft:

Q. What I would like to ask Mr. MacPhail is as to his personal opinion as to whether or not the one hundred and seventy-five thousand dollar price at that point was fair and equitable.

    *    *    *    *    *    *

A. I personally thought it was more than fair and equitable. I personally thought that our

government argues that this evidence was ambiguous and unreliable. We decline to debate the relative merits of the trial evidence. The district court certainly committed no clear error in admitting this evidence. All of it was relevant to determining the value of the player contracts. And the evidence reviewed together is sufficient to support the district court's judgment.

Essentially, the government simply failed to prove its case at trial. It expended a great deal of effort attempting to prove that the players were not worth as much as the plaintiff claimed and that the franchise was worth more than the plaintiff claimed. The district court's ruling does not indicate that the government's evidence was wholly invalid, but rather than the plaintiff carried his burden of proof. For example, the government sharply disagreed with the contention that a franchise in Milwaukee was worthless in 1970. It noted that the Brewers franchise included the right to play other major league teams, the right to eighty percent of gate receipts from home games and twenty percent of gate receipts from games played in other cities, territorial exclusivity, exclusive local broadcasting rights, and the right to sell concessions at home games. Although these rights indeed are worth something, the plaintiff's expert evidence indicated that the franchise in 1970 was not as valuable as the government claimed because of the great risk of failure and the relatively poor commercial-

baseball climate in Milwaukee. Moreover, the plaintiff submitted ample evidence of the value of the roster; after all, the players are principally responsible for winning games, drawing fans, and maintaining the financial health of the franchise.

Finally, the district court's decision to rely on the plaintiff's appraisals instead of the government's appraisals is affirmed. The district court had broad discretion on issues of credibility and in assessing the weight of the evidence. The government's appraisals were prepared twelve years after the Pilots-Brewers sale. In addition, Soriano's figure of $3.2 million was significantly lower than the value he put on the players when he sold the Pilots. Walsh's appraisal was based on memory and statistical research. There was ample reason for the court's conclusions.[17]

## B

*And to the man who is too old to keep up with the attempt to civilize football, and too young to need so soothing a sedative as golf; who works hard when he works and wants to rest hard when he rests; ... who wants a race that cannot be fixt like a horse race ... to that man baseball is the one great lifesaver in the good old summer-time.*[18]

Our decision that the district court committed no clear error is supported by *Laird*, 556 F.2d at 1237–42. In *Laird*, the

---

costs, our development costs were far more than that and that the 175 was a fair price for the expansion team.

Q. There was also a one hundred thousand dollar fee that was going to be paid for the American League franchise, is that correct?
A. Correct.
Q. Do you think it was fair and equitable to allocate the majority of the price, that is five million two hundred fifty thousand dollars, to the players and only one hundred thousand dollars to the franchise?

\*   \*   \*   \*   \*   \*

A. As far as my personal feelings, I think it was because as far as I could see, the only thing that an expansion team was getting other than the right to operate in an area, the only thing they were getting were the player contracts.
Tr. vol. 9, at 1056–57.

**17.** Section 212 of the Tax Reform Act of 1976, 26 U.S.C. § 1056(d) (1976), now establishes a presumption that no more than 50 percent of the purchase price of a sports enterprise is properly allocable to the player contracts. This action is not governed by that section. The government argues that Section 212 nevertheless indicates the impropriety of a 95-percent allocation. The section does allow, however, for proof by a taxpayer that a specific amount exceeding 50 percent should be allowed. Congress clearly wanted to limit the tax benefits accorded to the sale of a club. But, Congress's opinion on whether taxpayers in the past had allocated unreasonable amounts to player contracts does not weigh against the plaintiff here.

**18.** Los Angeles Times, 1916.

taxpayer paid the National Football League and its member teams $8.5 million for the Atlanta Falcons. The taxpayer allocated $7.7 million of the purchase price to the value of the forty-two player contracts he acquired. The district court rejected that valuation and allocated only $3.03 million to the player contracts. The government argues that *Laird* supports its claim that the plaintiff's allotting ninety-five percent of the purchase price to player contracts is improper. The government misinterprets *Laird*. The district court in that case did not decrease the player contracts allocation because the franchise was relatively more valuable. Instead, the taxpayer's error was his failure to subtract from the purchase price the value of the television rights he bought from the NFL. The district court concluded that those rights had a present value of $4.3 million, and thus the court calculated that only $3.5 million remained for allocation to the franchise and the player contracts. The court allocated eighty-eight percent of that amount to the players and only twelve percent to the franchise. The Fifth Circuit affirmed, noting the narrow scope of its review and stating, "Indeed, it is clear that the players are the primary assets of a professional football club. Without them, there could not be a game." 556 F.2d at 1237.

The plaintiff here did not purchase any television rights from the Seattle Pilots. Moreover, the American League franchise the plaintiff bought did not include at that time a right to share television revenue. The government does not contest the $100,000 allocation to equipment and supplies. Nor does the government contest that the remaining $10.7 million of the purchase price had to be split between only the players and the franchise. The plaintiff's decision to allocate ninety-five percent of that amount to the value of the player contracts is not significantly different from the eighty-eight percent allocation approved in *Laird*.[19]

## V

*Oh! somewhere in this favored land
the sun is shining bright;
The band is playing somewhere, and
somewhere hearts are light.
And somewhere men are laughing, and
somewhere children shout;
But there is no joy in Mudville—
mighty Casey has Struck Out.*[20]

There should be joy somewhere in Milwaukee—the district court's judgment is affirmed.

AFFIRMED.

---

19. The district court's conclusion is facially inconsistent with *First Northwest Industries v. Commissioner*, 70 T.C. 817 (1978), *rev'd and remanded on other grounds*, 649 F.2d 707 (9th Cir.1981), in which the Tax Court held improper an allocation of 91 percent of the purchase price of the Seattle Supersonics, a National Basketball Association expansion team, to the right to draft players and only nine percent to the value of the franchise. The court lowered the allocation from $1.6 million to $450,000. That case arose, however, on significantly different facts than the case before us. First, the Seattle Supersonics were an expansion team purchased from the league, not an existing franchise as were the Pilots. Second, First Northwest bought television rights (the NBA was under contract with the American Broadcasting Company). Third, First Northwest also bought the right to share in revenues from playoff and all-star games.

Each case must be resolved on its own facts. The Tax Court was not persuaded by the evidence before it. 70 T.C. at 848. The district court in this case was persuaded by the plaintiff's evidence—evidence of a completely different character from that presented by First Northwest.

20. Ernest L. Thayer, from Casey at the Bat.