**UNITED STATES of America, Appellee,**

v.

**Richard T. STROTHER, Defendant–Appellant.**

**No. 1226, Docket 94–1488.**

United States Court of Appeals, Second Circuit.

Argued Dec. 21, 1994.

Decided March 1, 1995.

Barry A. Bohrer, Morvillo, Abramowitz, Grand, Iason, & Silberberg, P.C., New York City (Christopher J. Gunther, Morvillo, Abramowitz, Grand, Iason, & Silberberg, P.C., on the brief), for defendant-appellant.

Leslie Cayer Ohta, Asst. U.S. Atty., D. of Conn., New Haven, CT (Christopher Droney, U.S. Atty., on the brief), for appellee.

Before: ALTIMARI, LEVAL and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Richard T. Strother ("Strother") appeals from a judgment of conviction entered in the United States District Court for the District of Connecticut (Covello, *J.*), following a jury trial, on one count of knowingly executing a scheme or artifice to defraud a financial institution by means of false representations, in violation of 18 U.S.C. § 1344. The thrust of the government's case was that Strother, an attorney and businessman, induced Christine Wollschleager, an employee of Connecticut Bank and Trust ("CBT"), to authorize payment of a single CBT check despite insufficient funds in his account by falsely representing that he would provide funds to cover the check. Strother's principal contention on appeal is that the district court committed reversible error in excluding two internal bank memoranda and statements contained in a third that he claims should have been admitted as either business records or prior inconsistent statements of Wollschleager, the government's chief witness. For the reasons set forth below, we reverse the judgment of the district court and remand for a new trial.

## BACKGROUND

The single check at issue was written for $82,500 on June 5, 1989 by Strother on an account at CBT in the name of Strother Film Partners I (the "CBT account"). The check was payable to Wall Street Clearing Co., a clearinghouse for Strother's brokerage firm, A.T. Brod ("Brod"). In mid-May 1989, Strother purchased $1,000,000 face value of bonds issued by Western Savings and Loan Association ("Western"), for $82,500. At that

time, he also held $1,266,000 face value of Western bonds that he had purchased previously through Brod. On June 5, Strother received a telegram from Wall Street Clearing Co. demanding that Strother either pay the $82,500 by the following day or face liquidation of his Western bonds.

To pay for the Western bonds, Strother sent a check for $82,500 drawn on the CBT account (the "CBT check"), although that account held only $610. The following day, Strother wrote a second check for $82,500 drawn on his personal account at Citibank (the "Citibank account"), payable to Strother Film Partners. The government alleged that Strother was aware that neither the CBT account nor the Citibank account had adequate funds to cover either check.

On June 9, 1989, Strother called Wollschleager, the interim manager at the Saybrook branch of CBT. Wollschleager testified that she was familiar with Strother, who "[a]lways kept very, very high balances" and was an "[e]xcellent customer." [A. 251–52]. When asked about the phone conversation, she testified at trial that Strother "said that he had written a check for $82,500, he asked me to pay the check, and said he was wiring me money" from his available funds. [A. 244]. She also stated that she believed the wire would arrive shortly, and that Strother never asked her to "hold" the check, which would have been impossible and contrary to bank regulations.

Strother did not wire any funds to CBT. On June 12, however, the Citibank check was deposited at the CBT branch in Saybrook, although the funds were unavailable at that time. On the same day, the CBT check was presented for payment to CBT. Because the CBT account lacked sufficient funds to cover the check, it appeared on CBT's overdraft list prepared on the morning of June 13. The list indicated that $82,500 in unavailable funds had been deposited. Although Wollschleager was aware that the CBT account contained insufficient funds, she authorized payment on the CBT check. She testified that she did so because of Strother's request on June 9 and his assurance that he would wire funds to CBT. [A. 251]. Wollschleager testified that she knew that

Strother had not wired the funds, but was not concerned because she assumed that Strother simply deposited the funds. [A. 252]. Had Strother wired the funds, she testified, they would have been available for deposit and the CBT check would not have appeared on the overdraft list. Wollschleager ordered payment on the CBT check even though she knew she was authorized to pay only up to $5000 on accounts with insufficient funds.

Several days later, Citibank refused to honor the Citibank check because Strother had insufficient funds in that account. Strother had also written a check for $82,500 dated June 12 on his account at European American Bank ("EAB"), for deposit at Citibank. EAB refused to make payment on this check because of insufficient funds in the EAB account. On June 20, Strother wrote a second check on the EAB account for the same amount for deposit with Citibank, which EAB again refused to honor because of insufficient funds.

Accordingly, the only bank to make payment on any of the four checks was CBT. On June 20, Strother, Wollschleager, and Rose Sbalcio, the new branch manager at Saybrook, met to discuss the CBT check. Sbalcio testified that Strother said that his broker had purchased the Western bonds without his permission, and that Strother had to make immediate payment to avoid trouble with the SEC. According to Sbalcio, Strother stated that he planned on covering the check with a large interest payment that was scheduled on the Western bonds on June 15. Those interest payments were never made, however, because on June 14 federal regulators seized Western, which was insolvent. [A. 343–45]. Ethel Lees, an assistant vice-president at CBT, testified that at a subsequent meeting on June 23, Strother said that he did not ask Wollschleager to pay the check, but instead asked her to hold it. [A. 284]. Strother never covered the CBT check, and CBT thereby incurred a loss of $82,500.

At trial, in addition to proof of the June 9 phone conversation and surrounding events, the government produced substantial evidence regarding allegedly false exculpatory

statements that Strother made to bank employees, including Sbalcio and Lees, and to FBI officials. Strother sought to introduce three internal bank memoranda as either business records or prior inconsistent statements. The district court excluded two of the memoranda, and admitted the third as a business record, but redacted most of the relevant portions. Strother, who did not testify or present any witnesses, was convicted after a three-day trial on the single count in the indictment. He was sentenced principally to twelve months' imprisonment, and now appeals.

## DISCUSSION

### 1. Exclusion of Memoranda

Strother's principal contention on appeal is that the district court erroneously excluded from evidence two internal bank memoranda and statements from a third that were essential to his defense. He contends that each should have been admitted as either a business record or a prior inconsistent statement of Wollschleager. Through these memoranda, Strother sought to establish: that Wollschleager's testimony regarding the phone call was unreliable; that Strother never expressly or impliedly requested that CBT make payment on the check; and that Wollschleager authorized payment not based on Strother's assurances, but instead because of her own mistaken belief that sufficient funds had been wired into the CBT account. As the government conceded at oral argument, had Strother merely asked Wollschleager to hold, rather than pay, the check, no crime would have occurred. We will first review each of the memoranda, and then consider whether the district court erred in its rulings.

### Wollschleager Memorandum

Wollschleager prepared a memorandum at Sbalcio's direction, which was dated June 22, 1989, thirteen days after her phone conversation with Strother (the "Wollschleager Memorandum"). Wollschleager testified that it was "the ordinary business of the bank to keep such" memoranda. [A. 262]. Similarly, Lees testified that it was the regular part of CBT banking practices to have reports generated by the employees involved in such incidents. [A. 278]. The Wollschleager Memorandum provided in relevant, part that Strother called,

> stating he expected a check to hit his account, but he was having a deposit wired in—the deposit was credited 6/12/89 and at the same time a check was presented in the amount of $82,500.00, the account showed that it was using unavailable funds. Because of the phone call, and Richard Strother being a known customer, and the deposit being made the check was paid and charged. [A. 142].

The memorandum did not make any reference to a request by Strother that Wollschleager pay the CBT check.

### Probation Memorandum

CBT placed Wollschleager on probation because she failed to follow bank policy when approving payment on the CBT check. Sbalcio prepared a memorandum dated August 29, 1989 (the "Probation Memorandum") recounting the incident, which Wollschleager signed, confirming that she "discussed this memo to my file." [A. 143]. The memorandum states that Strother

> told Christine that he was wiring funds into his account . . . to cover a check that was to be presented for payment on that day. . . . On June 13, 1989, the morning overdraft report showed that one item was submitted for payment of $82,500 against unavailable funds of $82,500. Mr. Strother had not wired the funds to CBT but had deposited a check drawn on Citibank, N.A. **Since Christine was unaware of this transaction, she approved payment of the overdraft.** (emphasis added). [A. 143].

Like the Wollschleager Memorandum, the Probation Memorandum did not expressly note that Strother had requested payment on the CBT check. Moreover, the Probation Memorandum contradicted Wollschleager's trial testimony that she knew that Strother had deposited a check rather than wired funds. Wollschleager stated that it was in the ordinary business of the bank to keep such memoranda in its employees' files.

### Charge–Off Memorandum

The last memorandum at issue, which was prepared by Sbalcio on December 14, 1989, requested that the CBT accounting department "charge off" the $82,500 as a loss (the "Charge–Off Memorandum"). Such memoranda were routinely prepared whenever an obligation to CBT was charged off as a loss. Sbalcio testified that she included "[a]s much [information] as possible" in the document, some of which she learned from discussions with Wollschleager. [A. 370–72]. Although the Charge–Off Memorandum was admitted as a business record, the district court redacted all statements in the document attributable to Wollschleager. Like the other excluded documents, the Charge–Off Memorandum omitted any mention of an explicit request by Strother for the bank to pay the check. It also stated that

> On June 14, 1989 Christine discovered that a confirmation to approve use of unavailable funds had not been requested from the Area Manager.... Christine told the area office that the deposit would clear because the funds had been wired in. On June 16, 1989 Return Items informed Christine that a deposited item had been returned due to the unavailability of funds, Christine was told that the deposit of June 12, 1989 was a check and not a wire. [A. 144].

### Governing Law

As discussed above, Strother sought to offer all three memoranda as business records of the acts and events recorded therein. Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for:

> A memorandum ... of acts [or] events ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, ... all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

This Court has adopted "a generous view" of the business records exception, "construing it to favor [ ] the admission of evidence ... if it has any probative value at all." *United States v. Freidin*, 849 F.2d 716, 722 (2d Cir.1988) (internal quotations omitted). Although the "principal precondition" to admissibility is the sufficient trustworthiness of the record, *Saks Int'l, Inc. v. M/V Export Champion*, 817 F.2d 1011, 1013 (2d Cir.1987), the proffered record must meet all of the requirements of the exception, *see Freidin*, 849 F.2d at 720–21 (construing "regular practice" element strictly). The determination of whether a record is sufficiently reliable to warrant its admission is within the "sound discretion" of the district court. *Potamkin Cadillac Corp. v. B.R.I. Coverage, Corp.*, 38 F.3d 627, 633 (2d Cir.1994) (citations omitted).

Strother also sought to introduce the three memoranda as prior inconsistent statements of Wollschleager in an effort to impeach her credibility. A witness's prior statement may be offered to impeach that witness's credibility if (1) the statement is inconsistent with the witness's trial testimony, (2) the witness is afforded an opportunity to deny or explain the same, and (3) the opposing party is afforded the opportunity to cross-examine the witness thereon. *See* Fed. R.Evid. 613(b). Under certain circumstances, a witness's prior silence regarding critical facts may constitute a prior inconsistent statement where "failure to mention those matters ... conflict[s] with that which is later recalled. Where the belatedly recollected facts merely augment that which was originally described, the prior silence is often simply too ambiguous to have any probative force...." *United States v. Leonardi*, 623 F.2d 746, 756 (2d Cir.) (citation omitted), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980). *See, e.g., United States v. Ayotte*, 741 F.2d 865, 870–71 (6th Cir.), *cert. denied*, 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984). At the same time, "statements need not be diametrically opposed to be inconsistent." *United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir.1988) (quotations omitted). We review a district court's determination of whether statements

are inconsistent with each other for an abuse of discretion. *See id.*

### Application

█ The district court excluded the Wollschleager Memorandum on the grounds that it was neither a business record nor a prior inconsistent statement. We conclude that the district court abused its discretion by not admitting the Wollschleager Memorandum as a prior inconsistent statement. Wollschleager testified at trial that Strother specifically asked her to make payment on the check. By contrast, the memorandum she prepared shortly after the incident omits any reference to such a request, although it does mention that Strother said he was wiring in funds to cover a check that he had written. It would have been "natural" for Wollschleager to include Strother's request in her earlier statement. *United States v. Stock,* 948 F.2d 1299, 1301 (D.C.Cir.1991).

Highlighting this inconsistency was essential to Strother's defense, which was that he never asked Wollschleager to pay the check, but instead asked her to hold it pending the wire of funds. As noted above, the government conceded at oral argument that if Strother had asked Wollschleager to hold the check rather than to pay it, no crime would have occurred. Moreover, in rebuttal summation, the government stressed that Wollschleager's recollection of the June 9 conversation "went virtually unchallenged," including her recollection that Strother asked her to pay the check. Accordingly, the district court should have admitted the Wollschleager Memorandum as a prior inconsistent statement to allow Strother to impeach Wollschleager's recollection of the phone conversation.

█ The district court also concluded that the Probation Memorandum was neither a business record nor a prior inconsistent statement. We believe, however, that the Probation Memorandum should have been admitted as a prior inconsistent statement. Like the Wollschleager Memorandum, this memorandum did not include any mention of a request for payment by Strother. More significantly, at trial, Wollschleager testified that she was aware that Strother had not

wired in funds, but had made a deposit by check instead. By contrast, the Probation Memorandum states that Wollschleager was unaware that Strother had deposited a check rather than wired funds. These inconsistencies clearly would have supported Strother's claim that Wollschleager authorized payment on the CBT check because of her own mistake, rather than because of Strother's alleged request.

█ The fact that Wollschleager herself did not prepare the Probation Memorandum should not have precluded its admission as a prior inconsistent statement. Although Sbalcio drafted the document, Wollschleager signed it and confirmed that she had discussed the memorandum with Sbalcio before it was placed in her file. We have noted, as have other courts, that a third party's characterization of a witness's statement can constitute a prior statement of the witness where the witness has "subscribed to that characterization." *United States v. Almonte,* 956 F.2d 27, 29 (2d Cir.1992). *See also United States v. Schoenborn,* 4 F.3d 1424, 1426–29 & n. 3 (7th Cir.1993) (witness did not adopt FBI agent's report of interview where witness refused to sign report after reviewing it); *United States v. Saget,* 991 F.2d 702, 710 (11th Cir.) ("witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own"), *cert. denied,* —— U.S. ——, 114 S.Ct. 396, 126 L.Ed.2d 344 (1993). Because Wollschleager adopted the Probation Memorandum, the district court erred in excluding the document as a prior inconsistent statement.

█ We do not believe, however, that the district court abused its discretion in declining to admit either the Wollschleager or Probation Memoranda as business records. Arguably both memoranda were created as a regular practice of a regularly conducted business activity, even though situations such as the one at issue did not arise on a daily basis. On the other hand, we have not subscribed to the view that "'the absence of routineness without more is not sufficiently significant to require exclusion of [a] rec-

ord.' " *Freidin,* 849 F.2d at 720–21 (quoting 4 J. Weinstein & M. Berger, Weinstein's Evidence § 803(6)[03], at 803–182). We are reluctant to adopt a rule that would permit the introduction into evidence of memoranda drafted in response to unusual or "isolated" events, *see Freidin,* 849 F.2d at 720, particularly where the entrant may have a motive to be less than accurate, *see, e.g., Romano v. Howarth,* 998 F.2d 101, 108 (2d Cir.1993); Fed.R.Evid. 803(6) advisory committee's note ("Absence of routineness raises lack of motivation to be accurate."). Under the circumstances, therefore, we conclude that the district court did not abuse its discretion in refusing to admit the Wollschleager and Probation Memoranda as business records.

■ The district court admitted the Charge–Off Memorandum as a business record, but redacted the hearsay statements attributable to Wollschleager. The memorandum was inconsistent with Wollschleager's trial testimony much like the Probation Memorandum. Unlike either the Wollschleager or Probation Memoranda, however, the Charge–Off Memorandum was not Wollschleager's statement. Sbalcio prepared the document, and the record does not suggest that Wollschleager adopted the statement as her own. Accordingly, the district court did not err in declining to admit the document as a prior inconsistent statement.

■ Nor did the district court err in declining to admit the excluded portions of the Charge–Off Memorandum as a business record, in view of the fact that this memorandum was made six months after the relevant events and contained narrative statements based on multiple hearsay, rather than entries relied on by a functioning entity as a record of its transactions. The timeliness with which a report is prepared with relation to the events recorded therein is important " 'to assure a fairly accurate recollection of the matter ... [and] because any trustworthy habit of making regular business records will ordinarily involve the making of the record **contemporaneously.**' " *Seattle–First Nat'l Bank v. Randall,* 532 F.2d 1291, 1296 (9th Cir.1976) (quoting 5 Wigmore, Evidence 1526) (emphasis in original). *See, e.g., Willco Kuwait (Trading) S.A.K. v. deSavary,* 843 F.2d 618, 628 (1st Cir.1988); *Selig v. United States,* 740 F.2d 572, 578 (7th Cir.1984); *In re Drexel Burnham Lambert Group, Inc.,* 160 B.R. 729, 735 (S.D.N.Y.1993).

■ In summary, we conclude that the district court erred in failing to admit the Wollschleager and Probation Memoranda into evidence as prior inconsistent statements. Moreover, we reject the government's claim that, because Strother was permitted to cross examine Wollschleager as to the two documents, the district court errors were harmless. Extrinsic evidence of a prior inconsistent statement is more persuasive to a jury than a witness's acknowledgement of inconsistencies in a prior statement. *See United States v. Browne,* 313 F.2d 197, 199 (2d Cir.), *cert. denied,* 374 U.S. 814, 83 S.Ct. 1707, 10 L.Ed.2d 1037 (1963); *see also United States v. Lashmett,* 965 F.2d 179, 182 (7th Cir.1992). Because of the exclusion of the Wollschleager and Probation Memoranda, Strother was restricted from effectively presenting his defense that Wollschleager authorized payment of the CBT check not based on Strother's assurances and request for payment, but based on her mistaken belief that sufficient funds had been wired into Strother's account. *See United States v. Kohan,* 806 F.2d 18, 22 (2d Cir.1986) ("[w]hen an erroneous evidentiary ruling precludes or impairs the presentation of a defendant's sole means of defense, we are reluctant to deem it harmless"). Accordingly, we reverse and remand for a new trial.

## 2. Jury Instructions

■ Because we are ordering a new trial, we will also address the propriety of the jury instructions regarding Strother's allegedly false exculpatory statements, as this issue will certainly be raised again. As noted above, Strother made a variety of allegedly false exculpatory statements to bank officials and federal authorities shortly after the June 9 phone conversation. For example, in addition to his statements to Sbalcio on June 20 and to Lees on June 23, he told FBI agents in November 1991 that he asked Wollschleager to hold the check, and that his inability to cover the CBT check was due to EAB's failure to deposit certain funds in his account pursuant to a subordination agreement. The

district court instructed the jury, without objection from Strother, that a defendant's conduct, including false exculpatory statements, "may be considered by you in the light of all the other evidence in the case in determining guilt or innocence." [A. 466]. More specifically, the district court instructed:

> When the defendant voluntarily and intentionally offers an explanation ... intending to show his innocence ... [that] is later shown to be false, you may consider whether that evidence points to a consciousness of guilt. **Ordinarily, it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his or her innocence.**
> On the other hand, there may be reasons, fully consistent with innocence, that will cause a person to give a false statement showing their innocence.

> Whether or not evidence as to the defendant's voluntary explanation or statement points to a consciousness of guilt, and the significance, if any, to be attached to such evidence, are matters exclusively within your province. [A. 466–67].

Strother claims that this instruction erroneously permitted the jury to infer his guilt (as opposed to his mere consciousness of guilt) directly from evidence of false exculpatory statements. In particular, he objects to the highlighted language. *See United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir.1989) ("[f]alse exculpatory statements are not admissible as evidence of guilt, but rather as evidence of consciousness of guilt") (quotation omitted); *United States v. Morales*, 577 F.2d 769, 772–73 (2d Cir.1978) (charge that false exculpatory statements are "probative of the defendant's guilt" is error because it suggests such conduct is "unequivocally probative of guilt"); *United States v. DiStefano*, 555 F.2d 1094, 1104 (2d Cir.1977) (where evidence against defendant is weak, plain error to charge jury that it "may consider [false exculpatory statements] as circumstantial evidence of the defendant's guilt").

■ We have, however, approved the language adopted by the district court. In

*United States v. Durrani*, 835 F.2d 410, 424 (2d Cir.1987) (citations omitted), this Court stated, "Although this instruction might well have been clarified, it correctly stated the law in this circuit. False exculpatory statements made to law enforcement officials are circumstantial evidence and have independent probative force." Strother claims that this decision is distinguishable because the defendant there had testified at trial so that his credibility was at issue, whereas Strother did not take the stand. This distinction is not persuasive—false exculpatory statements have independent probative value regardless of whether a defendant testifies on his own behalf. *See United States v. Scheibel*, 870 F.2d 818, 822 (2d Cir.1989) (although false exculpatory statements cannot provide the sole basis for a conviction, they are evidence of a consciousness of guilt, which can be considered with other evidence in determining guilt or innocence); *Fernandez v. Fitzgerald*, 711 F.2d 485, 486 n. 1 (2d Cir.1983).

Other courts have similarly approved the use of the precise language Strother challenges. *See United States v. Perkins*, 937 F.2d 1397, 1401–02 & n. 2 (9th Cir.1990) (distinguishing *DiStefano*); *United States v. Cogdell*, 844 F.2d 179, 181 (4th Cir.1988); *United States v. Wells*, 702 F.2d 141, 143–44 & n. 2 (8th Cir.1983); *United States v. Barresi*, 601 F.2d 193, 194–95 (5th Cir.1979). Accordingly, viewing the charge as a whole, *see Fernandez*, 711 F.2d at 487, we conclude that the district court did not err in so instructing the jury. On remand, however, the district court may wish to clarify the charge to reflect more clearly that false exculpatory statements relate more logically to a defendant's state of mind—i.e., his consciousness of guilt rather than to the fact of guilt, and that they are not "unequivocally probative of guilt." *Morales*, 577 F.2d at 772–73.

## CONCLUSION

Based on the foregoing, we reverse the judgment of the district court and remand for a new trial.

CALABRESI, Circuit Judge, dissenting in part:

This is a close case, but I would affirm the conviction.

I agree with the majority that the district court's instructions to the jury on Strother's allegedly false exculpatory statements correctly described the law of this circuit, and I therefore join Part 2 of the court's opinion.

As to Part 1, I respectfully disagree.

I do not doubt that it would have been wise to admit the Wollschleager Memorandum. It is not a business record, but it does shed some light on Wollschleager's testimony. Still, the light it sheds is indirect, and I do not believe that it was an abuse of discretion for the district court to exclude it. The memorandum does not directly contradict Wollschleager's trial testimony that Strother asked her to pay the CBT check when it was presented for payment. It merely fails to mention that fact. The majority says that it would have been "natural" to mention it. Perhaps, but the issue is sufficiently in doubt that I am not prepared to say that the trial judge exceeded the bounds of discretion in refusing to admit the memorandum as a prior inconsistent statement.

The Probation Memorandum is another matter. It directly contradicts Wollschleager's statement at trial that she was aware, when she approved payment of Strother's check, that Strother had made a deposit by check, not by wire. The problem is that Wollschleager did not write the memorandum. As the majority points out, she did discuss it with the author, Sbalcio, and signed her name at the bottom. The statement that accompanies the signature, "I have discussed this memorandum to my file," is hardly an unequivocal adoption of the contents of the memorandum, however. At trial, Wollschleager testified that she did not know why she had signed the memorandum.

In the end, in view of her signature on the memorandum, I believe that the question of whether and to what extent Wollschleager intended to adopt the memorandum appropriately goes to the weight to be given the memorandum and not to its admissibility. I therefore conclude, with the majority, that the district court erred in declining to admit it.

But the uncertain weight to be given to the memorandum is not irrelevant to the question of whether the district court's error was harmful. The evidence of Strother's guilt in this case was very strong. Against this evidence, Strother offered little in the way of a defense. The only evidence that was improperly excluded, the Probation Memorandum, was, I believe, of very uncertain weight, and the harmful effects of its exclusion, if any, were mitigated by Strother's cross-examination of Wollschleager. The cross-examination brought to the jury's attention the fact that the Probation Memorandum contradicted Wollschleager's trial testimony. It may not have done so quite as forcefully as the memorandum itself would have, but it certainly made the point. Under the circumstances, I find it hard to believe that a jury would have come to any different conclusion if the Probation Memorandum had been admitted.[1]

The district court's error in excluding the Probation Memorandum was harmless in my judgment, and so I respectfully dissent.

---

1. As for the Charge–Off Memorandum, I agree with the majority that the district court did not err in refusing to admit the memorandum in its entirety.