104 F.3d 357
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES of America, Appellee,
v.
Jesus Eduardo PINO-LARA, Defendant-Appellant.
 No. 96-1352.
 United States Court of Appeals, Second Circuit.
 Dec. 16, 1996.
 
 Appeal from the United States District Court for the Southern District of New York (Patterson, J.).
 
 
 1
 APPEARING FOR APPELLEE: LEWIS J. LIMAN, Assistant United States Attorney, Southern District of New York, New York, NY.
 
 
 2
 APPEARING FOR DEFENDANT-APPELLANT: DARRELL B. FIELDS, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY.
 
 
 3
 S.D.N.Y.
 
 
 4
 AFFIRMED.
 
 
 5
 PRESENT: GRAAFEILAND, JACOBS, and CALABRESI, Circuit Judges.
 
 
 6
 This cause came on to be heard on the transcript of record from the United States District Court for the Southern District of New York, and was argued by counsel.
 
 
 7
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court is AFFIRMED.
 
 
 8
 A jury convicted Jesus Eduardo Pino-Lara of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(b)(1)(C). The United States District Court for the Southern District of New York (Patterson, J.) sentenced him to a term of 41 months imprisonment, to be followed by three years supervised release. Pino-Lara appeals his conviction on the ground that the district court abused its discretion by instructing the jury--over Pino-Lara's objection--regarding consciousness of guilt based on false exculpatory statements.
 
 
 9
 The evidence presented at trial showed that Pino-Lara entered the United States from Caracas, Venezuela, on September 16, 1995. He checked into the Ameritania Hotel in Manhattan, asked for a room for one night, and paid cash for the room. At first, he was assigned a room on the eleventh floor; however, after looking at the room, he asked to be moved. The receptionist then assigned Pino-Lara to Room 206, on the second floor, and created a unique card key for that room.
 
 
 10
 Earlier in the day on September 16, before Pino-Lara's arrival, a hotel housekeeper spent roughly 30 minutes cleaning Room 206. She emptied the bathroom trash can, and cleaned an upholstered chair in the room, ensuring that there was nothing wedged between the cushions and frame. Because a "Do Not Disturb" sign was hanging on the door from September 17 until at least 11 a.m. on September 18, the housekeeper did not enter or clean the room after Pino-Lara checked in.[1] Additionally, the receptionist testified that Pino-Lara did not ask to change rooms again, did not complain about his room, and did not ask to have the room cleaned. No one else had a key to Room 206.
 
 
 11
 At some time on September 17, a man approached Room 206, knocked on the door, and called out, "Eduardo, Eduardo, Eduardo, open the door, it's me, Frank." When no one answered, the man told the housekeeper that the room's occupant must have fallen asleep, and that he had to take the occupant to the airport. The housekeeper asked, "Is he leaving today?" The man did not respond.
 
 
 12
 On September 18, 1995, DEA agents received a report that narcotics were in Room 206 of the Ameritania Hotel. Three plainclothes agents went to the hotel at approximately 11:15 a.m., and knocked on the door. Pino-Lara, with a "normal" demeanor, admitted the men to the room. He readily consented to a search of the room, and signed a form giving his consent. He explained to the agents that he was in from Venezuela to meet with an attorney regarding an explosion in Venezuela, and gave the agents a videotape about the explosion.
 
 
 13
 When the DEA agents searched the room, they found a white plastic bag wedged between the cushion and the frame of the upholstered chair. The bag, which smelled strongly of feces, contained eight latex pellets containing a total of 63.5 grams of heroin of 91% purity. Additionally, in the bathroom garbage can, the agents found a brown paper bag, also smelling of feces, containing small plastic wrappings that had traces of heroin.
 
 
 14
 When the agents discovered the heroin and arrested Pino-Lara, he said "that's not mine, that was here, I just got to this room, I was up on the seventh floor, they just moved me back to this room yesterday."
 
 
 15
 Neither the plastic bag nor the pellets were dusted for fingerprints or dusted for the presence of blood or other biological matter. An x-ray of Pino-Lara showed nothing unusual about his internal organs; also, even though the pellets had traveled through a digestive tract, the bathroom was clean and the room was odor-free.
 
 
 16
 At trial, a Connecticut lawyer testified that he had travelled to Venezuela in September of 1993 to investigate the possibility of bringing a lawsuit in the United States concerning an explosion in Venezuela. The lawyer, Wayne Lambert, met an individual named "Pino," and gave Pino his business card and his home phone number because Pino stated that he was going to be in Connecticut the next week. Lambert testified that he spoke to Pino on August 12, 1995, and told him that his firm would not be representing clients on the Venezuela matter.
 
 
 17
 Lambert also testified that he was either at home or at work from September 16 to September 18, 1995, and that his home and work numbers were the same as those he had given Pino previously, but that he did not have an appointment with Pino in September, and indeed had never heard from him again after August.
 
 
 18
 Lambert's business card with the home telephone number written on the back was found among Pino-Lara's possessions, along with Pino-Lara's passport indicating that he had entered the United States on August 11, 1995.
 
 
 19
 Pino-Lara did not testify.
 
 
 20
 During the charging conference, Pino-Lara objected to the giving of a charge with respect to false exculpatory statements on the ground that it was "just a way of bolstering a specific factual argument that the government is free to make in its summation." The Court overruled this objection, stating that the charge was "appropriate" and "useful" in telling the jury "how to handle false exculpatories and how not to handle" them.
 
 The Court instructed the jury as follows:
 
 21
 False exculpatory statements to law enforcement officials are circumstantial evidence of a defendant's consciousness of guilt and have independent probative value. If you find that the defendant gave a statement in order to divert attention from himself, you may, but are not required to draw the conclusion that the defendant believed he was guilty. You may not, however, draw the conclusion on the basis of this alone, that is, that the defendant is, in fact, guilty of the crime for which he is charged.
 
 
 22
 Whether or not the evidence as to the defendant's statements showed that the defendant believed that he was guilty and the significance, if any, to be attached to any such evidence are matters for you, the jury, to decide.
 
 
 23
 On appeal, Pino-Lara contends that the district court erroneously instructed the jury that any false exculpatory statements made by Pino-Lara could be viewed as evidence of a guilty conscience.
 
 
 24
 It is settled law in this Circuit that "[f]alse exculpatory statements made to law enforcement officials are circumstantial evidence and have independent probative value." United States v. Strother, 49 F.3d 869, 877 (2d Cir.1995) (quoting United States v. Durrani, 835 F.2d 410, 424 (2d Cir.1987)). The trial court may instruct the jury as to the relevance of false exculpatory statements. Strother, 49 F.3d at 877; United States v. Scheibel, 870 F.2d 818, 822 (2d Cir.1989). The district court has discretion to decide whether or not to give such an instruction. See Fernandez v. Fitzgerald, 711 F.2d 485, 487 (2d Cir.1983). Given that Pino-Lara made a series of false statements to the DEA agents, a factual predicate for the charge was present. We cannot say that the district court judge abused his discretion in giving the charge regarding false exculpatory statements.
 
 
 25
 Judge Patterson's charge appropriately instructed the jury as to the significance, if any, to accord a false exculpatory statement. He instructed that such statements were evidence of consciousness of guilt, rather than actual guilt, and cautioned the jury that they could not find guilt solely on the basis of the false statements. See Scheibel, 870 F.2d at 822; Strother, 49 F.3d at 877. This instruction accords with the law of this Circuit; the fact that other Circuits may adopt a different approach is not controlling. See Federal Criminal Jury Instructions for the Seventh Circuit, Instruction 3.13 (1980); Manual on Criminal Jury Instructions for the Ninth Circuit, Instruction 4.03 (1995).
 
 
 26
 We have examined all of Pino-Lara's contentions, and find them to be without merit. The district court judge did not abuse his discretion by instructing the jury as to false exculpatory statements.
 
 
 27
 The judgment of conviction is AFFIRMED.
 
 
 
 [1]
 The housekeeper had used a false name and social security number when she worked because her visa did not authorize her to work. She acknowledged at trial that she had used her false name when she testified before the Grand Jury and when she initially met with prosecutors on this case